**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| ROBERT HUBOF, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>GENERAL MOTORS LLC,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ....................................................................................1
II. JURISDICTION & VENUE .......................................................................7
III. PARTIES.............................................................................................8
A. Plaintiff Robert Huboff.............................................................................8
B. Defendant ...........................................................................................10
1. General Motors, LLC .........................................................................10
IV. FACTUAL ALLEGATIONS ....................................................................11
A. Engine Oil Coolant Systems ...................................................................11
B. The Defect in the Class Vehicles .............................................................15
C. The Oil Cooler Defect Poses a Safety Risk to Vehicle Occupants and Other Motorists. .....................................................................................20
D. GM's Longstanding Knowledge of the Defect.........................................23
1. GM's Knowledge of the Oil Cooler Defect Gained from Pre-Release Design, Manufacture, Engineering, and Testing Data. .................................................................................................24
2. GM's Knowledge of the Oil Cooler Defect from Technical Service Bulletins ..........................................................................27
3. GM's Knowledge of the Oil Cooler Defect from Repair Data 32
4. GM's Knowledge of the Oil Cooler Defect Gathered from the Large Number of Replacement Coolant System Parts Ordered from GM ..............................................................................33
5. GM's Knowledge of the Oil Defect Gained from Class Member Complaints Made Directly to GM.....................................34
6. GM's Knowledge of the Oil Cooler Defect from Class Member Complaints Lodged with NHTSA.....................................36
V. APPLICABLE WARRANTIES ...............................................................44
VI. GM'S MARKETING AND CONCEALMENT .........................................47
VII. FRAUDULENT CONCEALMENT ALLEGATIONS...........................51
VIII. TOLLING OF STATUTES OF LIMITATIONS ....................................54
A. Fraudulent Concealment Tolling .............................................................54
B. Estoppel...............................................................................................54
C. Discovery Rule......................................................................................55
IX. CHOICE OF LAW ALLEGATIONS.........................................................56
X. CLASS ALLEGATIONS .........................................................................61
A. The Nationwide Class .............................................................................62
B. The State Classes ..................................................................................63
C. Numerosity...........................................................................................64

# TABLE OF CONTENTS
# (continued)

**Page**


D. Typicality ....64
E. Adequate Representation ....65
F. Predominance of Common Issues ....65
G. Superiority ....69
XI. CAUSES OF ACTION ....70
A. NATIONWIDE CLASS CLAIMS ....70
FIRST CAUSE OF ACTION: BREACH OF WRITTEN WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT ....70
SECOND CAUSE OF ACTION: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (MICH. COMP. LAWS § 440.2314) ....78
THIRD CAUSE OF ACTION: FRAUDULENT CONCEALMENT ....81
FOURTH CAUSE OF ACTION: UNJUST ENRICHMENT ....83
B. STATE CLASS CLAIMS ....84
1. IDAHO ....84
FIFTH CAUSE OF ACTION: VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT (Idaho Code Ann. § 48-601, et seq.) ....84
SIXTH CAUSE OF ACTION: FRAUDULENT CONCEALMENT (Idaho Common Law) ....89
SEVENTH CAUSE OF ACTION: BREACH OF EXPRESS WARRANTY (Idaho Code §§ 28-2-313 and 28-12-210) ....93
EIGHTH CAUSE OF ACTION: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Idaho Code §§ 28-2-314 and 28-12-212) ....97
NINTH CAUSE OF ACTION: UNJUST ENRICHMENT (Idaho Common Law) ....99
RELIEF REQUESTED ....100
DEMAND FOR JURY TRIAL ....102
CERTIFICATE OF SERVICE ....104

# I. INTRODUCTION

1. Plaintiff Robert Huboff brings this action for himself and on behalf of all persons ("Class Members") who purchased or leased certain vehicles equipped with uniform and uniformly defective engine oil cooling systems designed, manufactured, distributed, warranted and sold/leased by General Motors Company, General Motors LLC, and/or its related subsidiaries or affiliates (collectively, "GM"), as further described below.

2. The vehicles at issue in this action include the model year 2024-2027 Chevrolet Silverado 2500HD/3500HD and GMC Sierra 2500HD/3500HD trucks equipped with the 6.6L Duramax diesel engine (the "Class Vehicles").[1]

3. The Class Vehicles are equipped with engine oil cooling systems that use engine coolant, circulated through an engine oil cooler, to remove heat from and regulate the temperature of the engine's lubricating oil while maintaining separation between the engine oil and engine coolant ("Oil Coolant System"). The Oil Coolant System in the Class Vehicles contain defective engine oil coolers that are prone to crack or otherwise fail during normal and foreseeable operation (the "Oil Cooler Defect" or "Defect"). When the Oil Cooler Defect manifests, pressurized engine oil can escape through the failed oil cooler and enter the engine

[1] Plaintiffs reserve the right to amend the definition of "Class Vehicles," should further discovery reveal that additional models and model-years are affected by the Oil Cooler Defect.

cooling system and/or leak outside the Vehicle. This failure can rapidly deplete the engine's supply of lubricating oil, contaminate the engine and oil cooling systems and its components, deprive critical engine components of necessary lubrication, and result in overheating, loss of engine power, engine seizure, and sudden and catastrophic engine failure.

4. On information and belief, the Oil Coolant System is substantially the same, from a mechanical engineering standpoint, in all Class Vehicles, in that the Oil Coolant Systems in all Class Vehicles are made up of substantially the same components and all employ the same general mechanism to regulate engine oil temperature.

5. The Oil Coolant System in the Class Vehicles is defective because the engine oil cooler is insufficiently strong and durable to withstand the pressures, temperatures, thermal cycling, vibration, and other forces encountered during normal, expected, and foreseeable vehicle operation. As a result, the oil cooler is prone to prematurely crack or otherwise fail, allowing pressurized engine oil to escape into the engine cooling system and/or outside the Vehicle. This failure can rapidly deplete the engine's supply of lubricating oil, contaminate the engine and oil cooling systems and its components, deprive critical engine components of necessary lubrication, and result in overheating, loss of engine power, engine seizure, and/or sudden catastrophic engine failure.

6. The Oil Coolant System failure can first occur at low mileages, within the Defendant's New Vehicle Express Warranty periods.

7. Because of the high number of failures, replacement parts for the Oil Coolant System are on national backorder with long waiting periods—often many months—during which time Plaintiffs and Class Members must suffer without a functioning Class Vehicles.

8. The Oil Cooler Defect causes all or almost all of the engine oil to leak into the Coolant System and/or out of the Vehicle. Pointing to the resultant low engine oil levels and metal debris in the oil system, GM has denied Plaintiff and Class Members full warranty repair due to insufficient oil maintenance, often covering only the cost of oil cooler replacement and flush when a full engine replacement is necessary. Such denial leaves Plaintiff and Class Members responsible for tens of thousands of dollars of repairs for damage caused by the Oil Cooler Defect.

9. Even when consumers do receive replacement parts under warranty, GM replaces the parts with equally defective replacement parts, leaving the Oil Coolant System susceptible to repeated failure. As a result, GM's warranty service does not actually remedy the Oil Cooler Defect, resulting in its warranty to fail of its essential purpose.

10. When the Oil Cooler Defect manifests outside the applicable warranty period, Class Members are forced to bear the substantial costs of repairing the failed oil cooler, replacing contaminated cooling-system components, and repairing or replacing engines damaged by the resulting loss of lubrication, with repair costs potentially reaching tens of thousands of dollars. Moreover, because replacement GM oil coolers and related components have been subject to lengthy backorders, Class Members may be left without the use of their Vehicles for extended periods or forced to purchase aftermarket replacement parts when GM parts are unavailable.

11. The Oil Cooler Defect inhibits Plaintiffs and Class Members' expected reliable and safe use of their Vehicles and requires Class Members to go months without use of their Vehicles while waiting for replacement parts, pay out-of-pocket for engine replacements, and to pay for equally defective replacement parts that themselves are susceptible to failure.

12. The Oil Cooler Defect also creates a safety risk for Plaintiffs and Class Members because it subjects the occupants of the Vehicles to sudden and unexpected engine seizure.

13. On information and belief, prior to sale or lease of the Vehicles at issue, GM knew of the Oil Cooler Defect through sources such as pre-release evaluation and testing; repair data; replacement part sales data; early consumer

complaints made directly to GM, collected by the National Highway Transportation Safety Administration's Office of Defect Investigation ("NHTSA ODI"), and/or posted on public online vehicle owner forums; testing done in response to those complaints; aggregate data from GM dealers; and other internal sources. Yet despite this knowledge, GM failed to disclose and actively concealed the Oil Cooler Defect from Class Members and the public and continued to market and advertise the Class Vehicles as "reliable," and "durable," which they are not.

14. GM refused—and continues to refuse—to disclose the Defect to prospective customers and actively conceals and concealed the Defect from Plaintiffs and Class Members prior to and at the time of sale. GM has known of the Defect since at least August 2024, when it issued Service Update (N232430450) for 2024 L5P trucks, marked "URGENT – DISTRIBUTE IMMEDIATELY," addressing "Possible Engine Coolant Contamination" and directing dealers to inspect, flush, and replace coolant system components. The update required vehicles to be held from sale and allotted 11.0 hours of warranty-supported labor. Furthermore, in March 2025, GM issued a Technical Service Bulletin[2]

---

[2] TSBs are issued after automobile manufacturers open an investigation into a potential defect, compile their findings, draft a proposed remedy for internal review and then ultimately issue a finalized TSB to dealers. *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 958 (N.D. Cal. 2014) (observing TSBS are preceded by "an accretion of knowledge by [the manufacturer]." Courts have held that 16 months is a reasonable time period for a manufacturer to investigate and issue a TSB in response to a defect. *Butler v. Porsche Cars N. Am., Inc.*, No. 16-

*Footnote continued on next page*

(25-NA-052) which expressly stated that oil in the coolant "may be caused by a leaking engine cooler" and directed the replacement of the cooler, flushing, replacement of any contaminated rubber parts, the thermostat, and the coolant bottle. But GM nevertheless chose to conceal from Class Members that the components within the Oil Coolant System are defective and eventually will require costly repairs, and that the Defect reduced the value of the vehicle at the time of sale and/or will reduce the resale value of Class Vehicles.

15. GM has been plagued with customer complaints concerning premature failure of the Oil Coolant System in Class Vehicles as a direct result of the Defect yet has done nothing to protect the significant investment Class Members made in these Vehicles.

16. Moreover, when customers whose Vehicles manifested the Defect bring in their Vehicles to GM's authorized technicians for repairs—whether in- or out-of-warranty - GM routinely denies warranty coverage for an engine replacement, leaving customers with the option of covering the repairs themselves or bearing the loss of the Vehicle's diminution in value.

17. GM has failed to provide an effective in-warranty fix for the Defect and forced Class Members to pay out-of-pocket to replace broken Oil Coolant

CV-02042-LHK, 2016 WL 4474630, at *5 (N.D. Cal. Aug. 25, 2016) (reasoning that a TSB issued eight months after the vehicle's sale supported a reasonable inference that the defendant knew of the defect at the time of sale).

System components and resultant engine damage with equally defective replacement parts, causing its warranty to fail of its essential purpose.

18. As a result of GM's alleged misconduct, Plaintiffs and Class Members were harmed and suffered actual damages, including that the Class Vehicles contain defective Oil Coolant Systems, have manifested and/or will manifest, the Oil Cooler Defect, and that GM has not provided an effective, no-cost remedy for this Defect within a reasonable amount of time. Furthermore, Plaintiffs and Class Members have incurred, and will continue to incur, out-of-pocket unreimbursed costs and expenses relating to the Oil Cooler Defect. As a result of the Defect, the Vehicles were worth less at the time of sale and/or will be worth less at the time of resale.

## II. JURISDICTION & VENUE

19. This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiff and other Class Members are citizens of a different state than Defendant.

20. This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction. This Court has personal jurisdiction over GM because GM is headquartered in this District, conducts substantial business in this

District, and some of the actions giving rise to the complaint took place in this District.

21. Venue is proper in this District under 28 U.S.C. § 1391 because Defendant, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction. Additionally, GM transacts business within this District, and some of the events establishing the claims arose in this District.

## III. PARTIES

### A. Plaintiff Robert Huboff

22. Plaintiff Robert Hubof is a citizen of the State of Idaho, and currently resides in Hayden, Idaho.

23. On December 5, 2023, Plaintiff purchased a new 2024 Chevrolet Silverado 2500 HD from Knudtsen Chevrolet, an authorized GM dealer in Post Falls, Idaho, for personal, family, and/or household use. His Class Vehicle bears the following VIN: 2GC4YMEY4R1158777.

24. Prior to purchasing his Class Vehicle, Plaintiff test drove the vehicle, viewed advertisements for the vehicle, viewed the vehicle's window sticker, and spoke with sales representatives concerning the vehicle's features. Neither Defendant nor its agents or other representatives informed Plaintiff of the Defect's existence at any time either prior to or following his purchase, whether at the point

of sale or otherwise. Plaintiff relied on Defendant's misrepresentations and omissions in deciding to purchase his vehicle.

25. In addition to touting many of the Class Vehicle's safety and performance features, the Vehicle's window sticker represented that the Vehicle was covered by Chevrolet's New Vehicle Limited Warranty. The availability of warranty coverage was important to Plaintiff and was a material consideration in his decision to purchase the Vehicle. Plaintiff understood the New Vehicle Limited Warranty to provide protection against defects in the Vehicle during the applicable warranty period and relied upon the availability of that warranty coverage in deciding to purchase the Vehicle.

26. In June of 2025, with approximately 16,453 miles on the odometer, the Coolant System in Plaintiff's Class Vehicle failed without warning. Plaintiff had noticed a low oil light on in the vehicle and filled the vehicle's oil reservoir with approximately 7 quarts of oil. A few days later, Plaintiff heard a loud bang from his vehicle and noticed oil in the coolant degas bottle in addition to oil leaking from under the vehicle.

27. Plaintiff subsequently brought his Class Vehicle to Knudtsen Chevrolet, where an authorized GM technician informed him his vehicle's engine cooling system was contaminated and filled with engine oil, that there was no oil showing on the vehicle's dipstick, and that there was metal debris present in the

oiling system. Plaintiff's vehicle was not repaired under warranty and Plaintiff was instead given a quote for repairs totaling $41,319.79.

28. Plaintiff's vehicle has not been repaired and is in unusable condition.

29. Plaintiff has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations associated with the Defect, including but not limited to the out-of-pocket cost he incurred to diagnose the Defect, loss of use of the vehicle, and the diminished value of his Class Vehicle. Additionally, Plaintiff overpaid for his Class Vehicle because if GM had disclosed the Defect to Plaintiff, he would not have bought his Class Vehicle or would have paid less for it.

## B. Defendant

### 1. General Motors, LLC

30. General Motors, LLC is a foreign limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan. General Motors, LLC was incorporated in 2009 and, effective on July 10, 2009, acquired substantially all assets and assumed certain liabilities of General Motors Corporation through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

31. At all times relevant herein, Defendant (themselves and through their related entities) engaged in the business of designing, manufacturing, marketing,

warranting, distributing, selling, leasing, and servicing automobiles, including the Class Vehicles, throughout the United States.

## IV. FACTUAL ALLEGATIONS

### A. Engine Oil Coolant Systems

32. The 6.6-liter L5P Duramax engine utilizes a pressurized lubrication system that circulates engine oil throughout the engine to lubricate and protect critical engine components. As part of this system, pressurized engine oil passes through an engine oil cooler mounted to the lower portion of the engine. The oil cooler functions as a heat exchanger that uses engine coolant to remove heat from and regulate the temperature of the engine oil.



***Figure 1.*** L5P engine oil-cooler/filter assembly and transparent-cover view showing associated seals. Source: General Motors, Service Bulletin 18-NA-150, p. 2, images 5053869 and 5053871.

33. The engine oil cooler operates in conjunction with the engine cooling system. Engine oil and engine coolant circulate through separate passages on opposite sides of the oil cooler's metal heat-transfer surfaces. This configuration

permits heat to transfer between the engine oil and coolant while preventing the two fluids from mixing. The oil cooler therefore must both regulate engine oil temperature and maintain a reliable barrier between the pressurized engine lubrication system and the engine cooling system.

34. After passing through the lubrication system, engine oil is supplied to critical engine components, including the crankshaft and camshaft bearings, connecting-rod bearings, piston-cooling channels, upper valve train, and turbocharger. Maintaining an adequate supply of engine oil is essential to the lubrication, cooling, and protection of these components.




| | | | | | |
|---|---|---|---|---|---|
| 1. | Upper Valve Train Components | 2. | Sub Oil Gallery | 3. | Oil Cooler |
| 4. | Main Oil Gallery | 5. | Left Bank Piston Cooling Channel | 6. | Oil Pump |
| 7. | Vertical Crankshaft / Camshaft Bearing Galleries | 8. | Right Bank Piston Cooling Channel | 9. | Right Bank Sub Oil Gallery |

***Figure 2.*** L5P engine lubrication circuit, identifying the engine oil cooler as component 3. Source: GM Genuine Parts/ACDelco, *Next Generation GM Diesel Engines*, Fig. 7-5, p. 7-5. Earlier-L5P training illustration showing the general lubrication-system architecture.

35. Accordingly, the structural integrity of the engine oil cooler is critical to the proper operation of the engine. A breach in the oil cooler can allow pressurized engine oil to escape from the lubrication system and enter the engine

cooling system and/or leak outside the Vehicle. Such a failure can contaminate the engine cooling system while simultaneously depleting the engine's supply of lubricating oil, potentially starving critical engine components of lubrication and causing severe engine damage or catastrophic engine failure.

36. Beginning with the 2024 model year, GM installed revised engine-oil-cooler assemblies in the Class Vehicles. GM parts catalogs identify engine-oil-cooler part no. 12734217 for certain 2024 L5P vehicles built before November 30, 2023, and identify part no. 12735508 as a second-design cooler. GM's present replacement and service part, part no. 12738896, which is also sold as ACDelco part no. 12738896, supersedes those cooler assemblies and is presently cataloged by GM for model-year 2024 through 2026 Chevrolet Silverado 2500HD and 3500HD and GMC Sierra 2500HD and 3500HD vehicles.

37. GM describes part no. 12738896 as an aluminum, 15-row engine-oil heat exchanger designed to maintain proper engine-oil operating temperatures. On information and belief, the original-production and superseding oil-cooler assemblies described above perform the same relevant functions and share substantially similar designs and architecture.



***Figure 3.*** GM Genuine Parts engine-oil-cooler service assembly, Part No. 12738896. Source: GM Genuine Parts product catalog. Product photograph of a new service component; not a failed unit.

**B. <u>The Defect in the Class Vehicles</u>**

38. Beginning with the 2024 model year, GM equipped the Class Vehicles with revised engine oil cooler assemblies. The oil coolers installed in the Class Vehicles are defective because they are insufficiently strong and durable to maintain their structural integrity and the required separation between the pressurized engine lubrication system and the engine cooling system during normal, expected, and foreseeable vehicle operation resulting in the Oil Cooler Defect.

39. As a result of the Oil Cooler Defect, the engine oil cooler is prone to prematurely crack, rupture, or otherwise develop a breach that permits pressurized

engine oil to escape from the engine lubrication system. Escaping engine oil can enter and contaminate the engine cooling system and/or leak outside the Vehicle.

40. When the Oil Cooler Defect manifests, the resulting loss of engine oil can rapidly deplete the engine's supply of lubricating oil. At the same time, oil entering the cooling system contaminates the coolant and cooling-system components, requiring extensive flushing and replacement of contaminated components.

41. Depletion of the engine's lubricating oil can deprive critical engine components—including the crankshaft and camshaft bearings, connecting-rod bearings, piston-cooling circuits, valve train, and turbocharger—of necessary lubrication. The resulting oil starvation can cause excessive friction and heat, metal-on-metal damage, loss of engine power, engine seizure, and catastrophic engine failure.

42. The Oil Cooler Defect can manifest suddenly and at relatively low mileages, including while Class Vehicles remain within GM's warranty periods. Because the oil cooler is an internal mechanical component and the failure can occur without meaningful advance warning, owners and lessees may have no reasonable means of detecting the Oil Cooler Defect before substantial quantities of engine oil have escaped from the lubrication system and damage has occurred.

43. GM knew or should have known that an engine oil cooler that is insufficiently strong and durable to withstand the pressures, temperatures, thermal cycling, vibration, and other conditions encountered during normal and foreseeable operation could prematurely crack or otherwise fail, permitting engine oil to escape from the lubrication system, contaminate the cooling system, deprive critical engine components of lubrication, and cause severe engine damage or catastrophic engine failure.

44. The Oil Cooler Defect is not remedied by replacing a failed oil cooler with another oil cooler that shares the same defective design or substantially similar architecture. On information and belief, GM has declined to repair some Class vehicles, and when GM has replaced failed oil coolers in Class Vehicles, they do so with replacement oil coolers that remain susceptible to the same or substantially similar failure, leaving Class Members' Vehicles susceptible to repeated manifestation of the Oil Cooler Defect.

45. The widespread demand for replacement oil coolers and related components has resulted in replacement parts being placed on national backorder. Class Members whose Vehicles experience the Oil Cooler Defect therefore can be deprived of the use of their Vehicles for weeks or months while awaiting replacement parts.

46. The consequences of the Oil Cooler Defect extend beyond replacement of the failed oil cooler itself. Because manifestation of the Defect can introduce engine oil throughout the engine cooling system and deprive the engine of necessary lubrication, repairs may require extensive flushing and replacement of contaminated cooling-system components and, where oil starvation has damaged internal engine components, repair or replacement of the engine.

47. Despite these consequences, GM has denied warranty coverage for some or all of the engine damage resulting from manifestation of the Oil Cooler Defect, leaving Class Members responsible for repair costs that can total tens of thousands of dollars.

48. The Oil Cooler Defect is covered by both GM's New Vehicle Limited Warranties, which cover repairs required as a result of defects in materials or workmanship for three years or 36,000 miles, whichever occurs first and GM's Powertrain Component coverage which covers repairs to listed components for five years or 100,00 miles, whichever occurs first. The Powertrain Component Coverage expressly includes the "integral oil cooler" among the covered diesel components. Nevertheless, GM routinely denies coverage for engine damage resulting from the Oil Cooler Defect. Other Class Vehicles may not manifest the Oil Cooler Defect until after the applicable warranty period has expired, including at mileages shortly beyond the warranty period.

49. Even where Class Members tender their Vehicles for repair during the warranty period, GM has failed to provide an effective repair for the Oil Cooler Defect. Class Members have reported receiving replacement oil coolers and related repairs only to remain susceptible to subsequent oil-cooler failure. By replacing defective components with components that remain susceptible to the same or substantially similar failure, GM fails to provide a repair that remedies the Oil Cooler Defect and causes its warranty to fail of its essential purpose.

50. GM could have disclosed the Defect to prospective purchasers and lessees through its advertising, marketing materials, dealerships, or at the point of sale or lease. Instead, despite its knowledge of the Defect, GM failed to disclose it and continued selling and leasing the Class Vehicles without informing consumers that their engine oil coolers were susceptible to premature failure and the resulting contamination, loss of lubrication, engine damage, and substantial repair costs. To be clear, Plaintiff does not allege that GM-authorized dealerships were aware of the uniform, classwide Defect alleged herein nor that GM-authorized dealerships failed to disclose the Defect to Plaintiff or Class Members. GM was the only entity in possession of the testing results, data, and nationwide customer complaints regarding the Defect and GM had a duty to disclose this Defect to Plaintiff and Clas Members.

## C. The Oil Cooler Defect Poses a Safety Risk to Vehicle Occupants and Other Motorists.

51. The Oil Cooler Defect poses a serious safety risk to Vehicle occupants and other motorists because failure of the engine oil cooler can rapidly deplete the engine's supply of lubricating oil and deprive critical engine components of necessary lubrication. When the Defect manifests during vehicle operation, the resulting oil starvation can cause a sudden and unexpected loss of engine power, overheating, engine seizure, and/or catastrophic engine failure, with little or no warning and requiring the driver to maneuver a disabled or failing Vehicle out of moving traffic. The danger is particularly acute because the Class Vehicles are large, heavy-duty trucks that are routinely operated at highway speeds and used to tow trailers and other substantial loads. A sudden loss of motive power or engine failure under such conditions creates an unreasonable risk of collision and injury to Vehicle occupants and other motorists.

52. Reports from Class Vehicle owners demonstrate that these risks are currently being observed on the highways. An owner of a 2024 Chevrolet Silverado 2500 reported to NHTSA that shortly after the Vehicle was returned by a GM dealer, the owner experienced a "significant loss of power." After the Vehicle later illuminated its check-engine light while being driven, a GM dealer advised the owner to continue driving it. On the trip home, the Vehicle displayed an "Add engine oil" warning. The following morning, even after the owner added a gallon

of oil, no oil registered on the dipstick; the coolant reservoir contained engine-oil residue and the upper radiator hose had collapsed. The truck had to be towed to the dealer, which diagnosed a failed oil cooler.:[3]

> "I noticed a significant loss of power. I took the truck back to the dealer and told them about the issue. They had it another 2 days and returned it to me, saying there was nothing wrong. Approximately a week later, I was driving down the road and the check engine light appeared on the gauge cluster.... The service advisor ... told me to keep driving the truck, and it might go away.... as I pulled into my driveway, a message on the gauge cluster said, 'Add engine oil.' ... The next morning, I added a gallon of oil, and there were still no signs of oil on the dipstick.... After inspection, the dealer said the oil cooler had failed." NHTSA ODI 11660888 (Incident date April 10, 2025)

53. Other Class Vehicle owners have reported substantially more immediate highway safety events. An owner of a 2024 GMC Sierra 3500 Denali Ultimate reported that the oil cooler failed while the Vehicle was traveling on a freeway. The owner was able to "limp[] it home," but reported that during the final two or three miles the truck was "grinding and howling with no power." After stopping, the owner found no oil on the dipstick and found that the coolant reservoir was filled with black sludge. The dealer subsequently confirmed that the oil cooler had failed and replaced the cooler and associated components.

> "So apparently my oil cooler has failed. Happened while I was on the freeway on the way home. I limped it home. It was grinding and howling with no power the last 2 or 3 miles. Upon checking under the hood I had zero oil on the dipstick and the coolant reservoir was full of

[3] For this and other customer complaints quoted in this Complaint, quotes are left as written. Due to the sheer number of typographical and grammatical errors, [sic] notation has not been used. Any emphasis has been added, unless otherwise noted.

> black sludge. The dealership now has the truck and have stated that the oil cooler failed and are replacing it."
>
> **2024 GMC Sierra 3500 Denali Ultimate**
> Chevy and GMC Duramax Diesel Forum, "Catastrophic oil cooler fail," Aug. 17, 2025.

54. Another owner participating in the same discussion reported an oil-cooler failure in a 2024 Chevrolet Silverado 3500HD High Country while traveling on an interstate highway. The owner reported that the truck "immediately overheated," forcing an emergency stop while smoke and steam poured from the engine compartment and the temperature gauge redlined. The Vehicle ultimately had to be towed to the dealership. Significantly, the owner further reported that the dealership had three other trucks awaiting repair for the same condition.

> "It has been 7 weeks now since my oil cooler blew on the interstate. Truck immediately overheated and I pulled over asap, only to have smoke/steam pooring out of the engine compartment. Temp redlined and I immediately shut off motor as soon as stopped. . . . Ultimately, had it towed to dealership. . . . This is all being said with 3 other trucks at dealership with same issue."
>
> **2024 Chevrolet Silverado 3500HD High Country**
> Chevy and GMC Duramax Diesel Forum, "Catastrophic oil cooler fail," Sept. 27, 2025.

55. Other complaints to NHTSA corroborate the potential for catastrophic consequences. An owner of a 2024 Chevrolet Silverado 3500 reported that at approximately 35,126 miles "the oil cooler cracked and flooded my engine cooling system with over 2.5 gallons of oil causing catastrophic engine failure." **NHTSA**

**ODI 11695918.** Another owner of a 2024 GMC Sierra 2500 reported that the oil cooler "blew and mixed oil in coolant reservoir," potentially causing "overheating and engine seizure." According to that owner, a certified GM service center confirmed and repaired the oil-cooler failure, but the Vehicle had to be returned after the condition recurred within only five miles of the purported repair. **NHTSA ODI 11724478.**

56. These reports demonstrate that the foreseeable consequences of the Defect include loss of motive power, rapid overheating, oil starvation, engine seizure, and catastrophic engine failure while Class Vehicles are operating on public roads. Sudden loss of propulsion or engine failure in vehicles of this size and weight—particularly while traveling at highway speeds, towing, merging, passing, or operating in heavy traffic—creates an unreasonable risk of collision and injury to Vehicle occupants and other motorists.

### D. GM's Longstanding Knowledge of the Defect

57. On information and belief, GM learned of the Defect at least as early as 2024, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles, through sources such as pre-release evaluation and testing; investigations leading to dealer service bulletins; repair data; replacement part sales data; early consumer complaints made directly to GM, collected by NHTSA ODI, and/or posted on public online vehicle owner forums; testing done in

response to those complaints; aggregate data from GM dealers; as well as through other internal sources unavailable to Plaintiffs prior to discovery.

### 1. GM's Knowledge of the Oil Cooler Defect Gained from Pre-Release Design, Manufacture, Engineering, and Testing Data.

58. During the pre-release process of designing, manufacturing, engineering, and testing the Class Vehicles, GM necessarily would have gained comprehensive and exclusive knowledge about the Class Vehicles' Oil Coolant Systems, particularly the basic engineering principles behind the construction and function of the Systems and the expected conditions and uses the Systems would encounter in ordinary customer service.

59. An adequate pre-release analysis of the design, engineering, manufacture, and durability of the engine oil coolers installed in the Class Vehicles would have revealed that the oil coolers were insufficiently strong and durable to reliably maintain their structural integrity and the required separation between the pressurized engine lubrication system and the engine cooling system under normal and foreseeable operating conditions. Such analysis would have revealed that the oil coolers were susceptible to premature cracking or other failure, permitting engine oil to escape from the lubrication system, contaminate the engine cooling system and/or leak outside the Vehicle, deprive critical engine components of

necessary lubrication, and cause severe engine damage and/or catastrophic engine failure.

60. GM publicly represents that it subjects its vehicles and components to extensive pre-production testing and validation. GM identifies its Milford Proving Ground in Michigan as a facility responsible for "product development and durability testing," and states that its on-road testing accumulated approximately **1.5 million test miles in 2023 alone**. GM further represents that it operates proving grounds specifically to conduct comprehensive vehicle testing over rough terrain and in extreme climates. In describing its vehicle-development process, GM President Mark Reuss has stated that "[e]very aspect of every vehicle is put through the paces" under extreme conditions, including hot, cold, wet, dry, uphill, downhill, uneven-pavement, off-road, and high-speed operation. Accordingly, before releasing the Class Vehicles for sale, GM had unique access to extensive engineering and durability-test data concerning the ability of their components and systems to withstand the temperatures, pressures, vibration, loads, thermal cycling, and other conditions encountered during normal and foreseeable operation.[4]

---

[4] General Motors, *GM Quality, Durable, and Reliable Vehicles* (stating that GM accumulated 1.5 million on-road test miles in 2023, conducts comprehensive testing in rough terrain and extreme climates, and that the Milford Proving Ground is responsible for "product development and durability testing"), https://www.gm.com/company/gm-quality-standards (last visited Sept. 4, 2026); Mark Reuss, *Why GM President Mark Reuss Loves Visiting Milford Proving Ground*, General Motors (Sept. 25, 2024) (stating that "[e]very aspect of

*Footnote continued on next page*

61. This testing and validation were particularly material to the 2024 Class Vehicles because GM substantially revised the L5P Duramax powertrain for the 2024 model year. GM increased the engine's output to 470 horsepower and 975 lb-ft of torque, including up to a 25% increase in low-end torque, and incorporated an all-new turbocharger, new cylinder heads with revised cooling jackets, a new combustion system, higher-flow fuel injectors operating at increased injection pressure, and a new engine controller. **GM likewise changed the engine-oil-cooler assembly used in these vehicles. GM's current parts catalog identifies Part No. 12706188 for model-year 2020–2023 Silverado HD trucks, while identifying Part No. 12738896 for model-year 2024–2026 Silverado HD trucks.** GM itself represents that its current replacement oil cooler, GM Part No. **12738896**, is "designed, engineered and tested to rigorous standards," and that GM engineers "design and validate OE parts specifically" for the vehicles in which they are used. GM identifies the cooler as a heat exchanger responsible for maintaining engine-oil temperature within its designed operating range, thereby promoting engine efficiency and longevity. In light of GM's own extensive vehicle and component testing and validation, GM knew or should have known before sale

---

every vehicle is put through the paces" under extreme conditions and describing GM's vehicle-validation process), https://news.gm.com/home.detail.html/Pages/news/us/en/2024/sep/0925-mpg100-reuss.html (last visited Sept. 4, 2026).

that an oil cooler incapable of reliably containing and separating pressurized engine oil and engine coolant under ordinary operating conditions could fail prematurely, discharge engine oil into the cooling system, deprive critical engine components of lubrication, and cause the severe consequences alleged herein.[5]

### 2. GM's Knowledge of the Oil Cooler Defect from Technical Service Bulletins

62. Vehicle manufacturers, including GM, issue service updates and technical service bulletins to their authorized dealers to identify conditions encountered in particular vehicles and to provide inspection, diagnosis, and repair procedures for those conditions. GM's own bulletins state that they are written to inform professional technicians of "conditions that may occur on some vehicles" and to provide information that may assist in properly servicing those vehicles.

---

[5] General Motors, *The Ultimate Heavy Duty: GMC Introduces its Most Luxurious, Advanced and Capable Sierra HD Ever* (Oct. 6, 2022) (describing the enhanced 2024 6.6L Duramax and its increased horsepower and torque, all-new turbocharger, new cylinder heads with improved cooling jackets, all-new combustion system, next-generation higher-flow injectors and increased injection pressure, and all-new engine controller), GMC 2024 Sierra HD launch release (last visited Sept. 4, 2026); General Motors, *GM Genuine Parts Engine Oil Cooler, Part No. 12706188* (identifying Part No. 12706188 for model-year 2020–2023 Silverado 2500HD and 3500HD vehicles), GM Genuine Parts Oil Cooler 12706188 (last visited Sept. 4, 2026); General Motors, *GM Genuine Parts Engine Oil Cooler, Part No. 12738896* (identifying Part No. 12738896 for model-year 2024–2026 Silverado 2500HD and 3500HD vehicles and describing GM Genuine Parts oil coolers as heat exchangers "designed, engineered, and tested to rigorous standards" and OE parts designed and validated by GM engineers), GM Genuine Parts Oil Cooler 12738896 (last visited Sept. 4, 2026).

63. By no later than August 14, 2024, GM had identified engine-coolant contamination in the very vehicles at issue here. On that date, GM issued Service Update **N232430450**, titled "Possible Engine Coolant Contamination," specifically covering certain model-year 2024 Chevrolet Silverado 2500HD/3500HD and GMC Sierra 2500HD/3500HD vehicles equipped with the 6.6L L5P Duramax diesel engine. GM transmitted the update to dealers as **"URGENT – DISTRIBUTE IMMEDIATELY."** The Service Update instructed dealers to identify affected vehicles through GM's Investigate Vehicle History and Global Warranty Management systems and stated that it applied both to vehicles in dealer inventory and to customer vehicles returning to a dealership for any reason.

64. Service Update N232430450 instructed dealers to inspect the radiator surge tank for contamination, which GM described as a film of "oily black substance" floating on top of the coolant. If contamination was present, GM required an extensive flushing procedure and replacement of numerous cooling-system components, including the surge tank, radiator inlet and outlet hoses, heater hoses, and engine-coolant air-bleed components. GM assigned **11.0 hours of warranty labor** to the contamination-remediation procedure.[6] GM further required

---

[6] General Motors, Service Update N232430450, *Possible Engine Coolant Contamination* (Aug. 14, 2024) (applicable to certain 2024 Chevrolet Silverado 2500HD/3500HD and GMC Sierra 2500HD/3500HD vehicles equipped with the 6.6L L5P Duramax; directing dealers to inspect the radiator surge tank for contamination appearing as an "oily black substance"; providing 11.0 hours of

*Footnote continued on next page*

affected vehicles in dealer possession to be held and prohibited them from being delivered to customers, dealer-traded, released to auction, or used for demonstration or other purposes until the prescribed inspection and repair had been completed.




***Figure 4.*** GM's reference photograph of visible coolant contamination in a radiator surge tank. Source: GM Service Update N232430450, p. 2, image 6595860.

65. Several months later, on March 4, 2025, GM issued Service Bulletin **25-NA-052**, entitled "Information on Flushing Oil Contamination from Cooling System." Unlike the earlier L5P-specific Service Update, Bulletin 25-NA-052 applied broadly to GM passenger cars and light- and medium-duty trucks. But

---

warranty labor for the coolant flush and component-replacement procedure; and requiring affected vehicles in dealer possession to be held and inspected/repaired before delivery), GM TSB 11006368 (last visited Sept. 4, 2026).

the bulletin expressly identified the engine oil cooler as a potential source of the same oil-in-coolant condition, stating: “If you found oil in the coolant and the engine is otherwise healthy, this may be caused by a leaking engine oil cooler.” GM instructed technicians that, where engine coolant became contaminated with engine oil, they should **replace the engine oil cooler**, extensively flush the cooling system, replace all rubber components exposed to the oil, replace the thermostat and gasket, and ultimately replace the coolant bottle and cap.

66. GM also created a unique warranty labor operation—**4089458, “Coolant Flush to Remove Oil from Cooling System”**—for use with Bulletin 25-NA-052 and directed dealers to process qualifying repairs under GM’s Powertrain coverage. GM designated Labor Operation 4089458 as a ‘unique Labor Operation for bulletin use only,’ thereby providing GM with a discrete labor-operation code for repairs performed pursuant to the bulletin.[7]

67. These GM communications demonstrate an escalating awareness of the condition alleged here. By August 2024, GM had identified oil-like contamination of engine coolant in certain 2024 L5P Silverado and Sierra HD

[7] General Motors, Service Bulletin 25-NA-052, *Information on Flushing Oil Contamination from Cooling System* (released Mar. 4, 2025) (stating that oil found in engine coolant “may be caused by a leaking engine oil cooler”; directing technicians to replace the engine oil cooler, flush the cooling system, replace oil-contaminated rubber components, replace the thermostat and gasket, and replace the coolant bottle and cap; and establishing Labor Operation 4089458, “Coolant Flush to Remove Oil from Cooling System,” as a “unique Labor Operation for bulletin use only”), GM TSB Coolant Flush Procedure (last visited Sept. 4, 2026).

trucks, had identified the affected vehicles by VIN within its warranty-management system, had developed an extensive inspection and remediation procedure, and required affected dealer inventory to be withheld from customers until corrected. By March 2025, GM expressly recognized that oil contamination of engine coolant may be caused by a **leaking engine oil cooler** and directed replacement of that cooler when the condition was found. On information and belief, GM's engineering analysis, field reports, warranty data, returned-part analysis, dealer communications, and other investigation that resulted in these service publications necessarily preceded their issuance; the precise timing and substance of that investigation are presently within GM's exclusive possession and control.[8]

---

[8] *See, e.g.*, In re Gen. Motors Air Conditioning Mktg. & Sales Practices Litig., 406 F. Supp. 3d 618, 625 & n.15 (E.D. Mich. 2019) (concluding that allegations including GM technical service bulletins supported a plausible inference of pre-sale knowledge and explaining that later-issued bulletins may support such an inference because they are preceded by an "accretion of knowledge"); *Francis v. Gen. Motors, LLC*, 504 F. Supp. 3d 659, 684–85 (E.D. Mich. 2020) (explaining that issuance of service bulletins "plausibly suggests that a defendant knew about a defect for some time preceding their promulgation," because such technical guidance reasonably reflects an accumulation of knowledge as well as time spent investigating the cause and formulating a remedy); *Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 282 (E.D. Mich. 2021) (reasoning that where a manufacturer issues a service bulletin addressing the precise issue in the precise vehicle complained of, it is reasonable to infer knowledge of that issue at and before issuance of the bulletin); *see also In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 958 (N.D. Cal. 2014).

### 3. GM's Knowledge of the Oil Cooler Defect from Repair Data

68. GM also knew or should have known about the Defect because of the large number of claims for Oil Coolant System repairs and part replacements made during the Class Vehicles' warranty periods.

69. Consumers complain that the Defect often causes Oil Coolant System failures at low mileages, within the warranty period.

70. On information and belief, GM, like all vehicle manufacturers, communicates with its authorized service technicians in order to identify pervasive vehicle defects, and root causes and potential repairs. GM collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data, in order to determine whether a defect exists and should be covered under warranty or through a goodwill program.

71. GM also reviews and analyzes warranty data submitted by its dealerships and authorized technicians in order to identify defect trends in its vehicles. GM dictates that when a repair is made under warranty (or warranty coverage is requested), service centers must provide GM with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the defective component in case GM later decides to audit

the dealership or otherwise verify the warranty repair. For their part, service centers are meticulous about providing this detailed information about in-warranty repairs to GM because GM will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described. TSB 25-NA-052 provided a unique labor operation number for bulletin use only, allowing GM to specifically track instances of engine oil leaking into the coolant from a leaking engine oil cooler. Due to GM's efforts to monitor defect trends and the sheer number of repairs and warranty/goodwill requests made in connection with the Defect, GM knew or should have known of the Defect.

### 4. GM's Knowledge of the Oil Cooler Defect Gathered from the Large Number of Replacement Coolant System Parts Ordered from GM

72. Upon information and belief, GM also knew or should have known about the Defect because of the higher than expected number of replacement Oil Coolant System parts ordered from GM, which should have alerted GM that this was a Defect affecting a wide range of its Vehicles.

73. Upon information and belief, GM service centers use GM replacement parts that they order directly from GM. Furthermore, independent vehicle repair shops that service Class Vehicles also order OEM parts directly from GM. Therefore, GM would have detailed and accurate data regarding the number and frequency of replacement part orders. The ongoing high sales of replacement Oil

Coolant System parts – indeed so much so that the parts were (and continue to be) on national backorder – was certainly known to GM, and should have alerted GM that its Oil Coolant Systems were defective and causing Class Vehicles' Engine Coolant Systems to fail.

### 5. GM's Knowledge of the Oil Defect Gained from Class Member Complaints Made Directly to GM

74. GM also knew or should have known about the Defect because numerous consumer complaints regarding failures of the Oil Coolant System were made directly to GM. The large number of complaints, and the consistency of their descriptions of oil cooler failures in the Class Vehicles, should have alerted or actually alerted GM to this serious Defect affecting a wide range of its Vehicles.

75. GM also knew or should have known about the Defect because Class Vehicle owners repeatedly reported oil-cooler failures directly to GM or GM Customer Care. These reports described substantially similar failures involving loss of engine oil, leaking oil coolers, oil contamination of the cooling system, lengthy periods in which Vehicles remained disabled awaiting replacement parts, and GM's inability or refusal to provide an effective repair.

76. The complete universe of complaints made directly to GM concerning the Defect, including GM Customer Care case files, dealer field reports, warranty claims, technical-assistance communications, and other customer-contact records, is presently within GM's possession and is unavailable to Plaintiff before

discovery. Publicly available sources nevertheless confirm that GM was receiving complaints concerning oil-cooler failures in 2024 Class Vehicles from almost the beginning of the model year.[9]

77. For example, on November 11, 2023, the owner of a 2024 GMC Sierra 3500HD Denali equipped with the L5P Duramax reported on the GM-Trucks.com owner forum that, after an approximately 800-mile trip, engine oil had accumulated around the underside of the Vehicle near the oil filter and was leaking under pressure. The owner specifically questioned whether the condition was an oil-cooler failure. On November 16, 2023, GM Customer Service, posting under the username "GMCustomerService," responded directly to the owner, stated that its team would investigate the 2024 Sierra 3500 oil leak, and requested the owner's contact information, VIN, description of the problem, and preferred GM dealership. On November 28, 2023, the owner reported that the dealer had confirmed that "[i]t was the oil cooler leaking," that replacement parts were on backorder with no estimated availability, and that the Vehicle already had been out of service for sixteen days. The owner further reported communicating with GM Customer Service concerning the failure. Thus, GM Customer Service had actual

[9] *See 2024 3500 Oil Leak*, GM-Trucks.com (Nov. 11, 2023–Sept. 2024) (GM Customer Service responding Nov. 16, 2023 to owner of 2024 GMC Sierra 3500HD concerning suspected oil-cooler leak and requesting VIN, contact information and preferred dealer; owner subsequently reporting dealer-confirmed oil-cooler leak and communications with GM Customer Service), https://www.gm-trucks.com/forums/topic/265097-2024-3500-oil-leak/ (last visited Sept. 4, 2026).

notice of an oil-cooler failure involving a 2024 L5P Class Vehicle no later than November 2023.

78. The complaints continued. On September 21, 2024, another owner reported that his 2024 2500HD Duramax displayed an "add oil" warning while being driven. After stopping, the owner discovered engine oil in the coolant reservoir and had the Vehicle towed to a GM dealership. The owner's GM service advisor thereafter advised him that the oil cooler had cracked and flooded the engine cooling system, and that several required replacement parts were backordered. The owner characterized the event as a catastrophic failure and asked whether GM intended to conduct a recall. This report appeared in the same owner-forum discussion in which GM Customer Service had been actively responding to oil-cooler complaints.

79. As the above sampling of complaints shows, Class Members have been vocal in complaining directly to GM about the Defect, and the number and consistency of their complaints should have alerted GM about the Defect.

### 6. <u>GM's Knowledge of the Oil Cooler Defect from Class Member Complaints Lodged with NHTSA</u>

80. In addition to complaints made directly to GM, many Class Vehicle owners and lessees lodged complaints about the Oil Cooler Defect with NHTSA ODI.

81. Federal law requires automakers like GM to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement, backed by criminal penalties for violation, of confidential disclosure of defects by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

82. Thus automakers should (and do) monitor NHTSA databases for consumer complaints regarding their automobiles as part of the automakers' ongoing obligation to identify potential defects in their vehicles, such as failures of Oil Coolant Systems.

83. From its monitoring of the NHTSA databases, GM knew or should have known of the many complaints about the Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, GM to the Defect.

84. A sampling of the publicly available complaints lodged with NHTSA ODI, includes some of those quoted above, as well as the following:

> "The engine oil cooler failed causing engine oil to leak into the coolant system on my 2024 Chevy Silverado 3500HD. This requires a full replacement of the coolant system. In addition, excessive sludge buildup inside the motor is caused. This is a known issue with GM for 2024 Diesel vehicles. GM has released a service bulletin but is fighting my local dealership on the required repairs."
> NHTSA ID Number 11722446
> Incident date January 6, 2026
> 2024 Chevrolet Silverado 3500

"At approximately 35,126 miles the oil cooler cracked and flooded my engine cooling system with over 2.5 gallons of oil causing catastrophic engine failure."
NHTSA ID Number 11695918
Incident date August 27, 2025
2024 Chevrolet Silverado 3500

"The truck went to the dealer for recalls on March 21, 2025. The Truck is still within the bumper-to-bumper warranty. Recalls consisted of tailgate fix, TCM & ECM updates. The truck was returned to me approximately a week later. I noticed a significant loss of power. I took the truck back to the dealer and told them about the issue. They had it another 2 days and returned it to me, saying there was nothing wrong. Approximately a week later, I was driving down the road and the check engine light appeared on the gauge cluster. I immediately drove the truck to the dealer, and the DTCs were emissions-related. The service advisor, Jeff, told me to keep driving the truck, and it might go away. I drove the truck home, 20 mins away from the dealer, and as I pulled into my driveway, a message on the gauge cluster said, "Add engine oil." I notified the Dealer of the issue immediately. The next morning, I added a gallon of oil, and there were still no signs of oil on the dipstick. At that time, I noticed there was no coolant in the reservoir, but engine oil residue, and a collapsed upper radiator hose. The truck was towed to the dealer later that day. After inspection, the dealer said the oil cooler had failed. They sent me the service bulletin, but that bulletin only says, "oil and coolant mix," nothing about the disappearance of the fluid, and no explanation of the emissions codes. The dealer and GM's corporate office are refusing the share the diagnostic data on how they have concluded that the oil cooler has failed. Their solution is to replace the oil cooler and see what happens. This truck has 1000 miles left on the warranty, and the parts/procedures expire at the end of the bumper-to-bumper warranty. Recap: GM will not share diagnostic data, and they are refusing to extend coverage, yet their remedy is to experiment with my $70,000 truck, and the moment this truck is out of warranty, they are going to wash their hands of it. That is not acceptable."
NHTSA ID Number 11660888
Incident date April 10, 2025
2024 Chevrolet Silverado 2500

"The engine oil drained into the radiator from a flaw in there design in

which outrageously high labor cost for the owner of the vehicle they put a rubber house in the radiator in which leaked without any warning indicating that there was a problem with the oil nor the radiator coolant system. repairs are in the thousand and I as a consumer should have this matter resolved at no cost due to bad design cost they should have made a oil cooler with its own separation compartment like the transmission cooler because they are replaceing everything else what about the engine itself thats still going to be contaminated like all the replacement part, seal hoses,and radiator, coolant, and thermostat. How can just parts be contaminated but not the engine? They are just replacing things that costs alot. This is a drive train issue, there were no oil in the engine."

NHTSA ID Number 11700192
Incident date November 6, 2025
2024 GMC Sierra 3500

"Oil cooler blew and mixed oil in coolant reservoir. Possibly causes overheating and engine seizure. This has been confirmed with a certified GM service center. The service center inspected fixed it then within 5 miles had to be returned to the dealer because it happened again."

NHTSA ID 11724478
Incident Date January 14, 2026
2024 GMC Sierra 2500

"I own a 2024 GMC Sierra Denali Ultimate 2500HD diesel that has been out of service for 52 days due to an oil cooler / service bulletin related failure. The vehicle is under warranty. The required replacement part is on national backorder and, as of today, has not shipped. The current estimated ship date is February 17. During this time, neither the dealership nor GMC has provided proactive communication. I have had to repeatedly contact them for updates. This extended inability to repair a critical component, combined with the lack of parts availability and communication, raises concerns about the reliability of this system and the manufacturer's ability to support safe operation of the vehicle in a reasonable timeframe. The truck is my primary vehicle and is intended for towing and transportation. Being unable to repair it for nearly two months due to parts unavailability presents a significant safety and reliability concern."

NHTSA ID Number 11717560

Incident Date December 22, 2025
2024 GMC Sierra 2500

"I own a 2025 GMC Sierra with 30,000 miles. The oil cooler failed and caused loss of oil pressure and potential internal engine damage. . . . I am being instructed to continue driving the truck even though it may suffer catastrophic failure while driving. This is a safety hazard."
NHTSA ODI 11701995
Incident date November 5, 2025
2025 GMC Sierra 3500

"Oil cooler for truck is defective and thus allowed all oil to be mixed with the coolant. GM is stating they will flush engine and replace with ***exact same part.*** Very common issue and sad to have a $100k truck and it is junk."
NHTSA ODI 11706444
Incident date December 2025
2025 GMC Sierra 3500

Supposedly The oil cooler ended up failing causing oil to be pumped into the cooling system at 26000 miles 8 months after purchase. A low oil message popped up upon start up looked under the hood a noticed no oil on the dip stick and a coolant reservoir full of jet black oil (supposed to be a bright red) and a fluid level higher than the normally observed coolant level. Thankfully happened in my drive way. It could have left me stranded had the engine completely run out of oil/overheated etc. Had the coolant reservoir broke/cracked due to the extra pressure and added volume in the coolant system it would have leaked a coolant/oil mixture in the engine bay around hot components of the motor. (potential fire hazard in my opinion) thankfully was able to get it towed to the dealer before any major leaks of the coolant system or catastrophic damage (that I know of) occurred.
NHTSA ODI 11709269
Incident date December 27, 2025
2025 Chevrolet Silverado 2500

85. As demonstrated by this sampling of complaints submitted to NHTSA, owners of Class Vehicles have repeatedly reported substantially similar

oil-cooler failures involving loss of engine oil, contamination of the cooling system, overheating, engine damage and/or failure, prolonged loss of use, and concerns regarding the safety and adequacy of GM's repairs.

86. GM also actively monitors third-party Internet forums on which GM vehicle owners report vehicle defects and service problems. For more than a decade, GM Customer Care personnel have maintained an account under the name "GMCustomerService" on GM-Trucks.com, a third-party forum devoted to Chevrolet and GMC trucks. The account has made thousands of posts responding to owners' reported vehicle problems, requesting VINs, customer contact information, descriptions of the reported conditions, and identification of the owners' preferred GM dealerships so that GM can investigate the complaints. GM Customer Care personnel have expressly identified themselves on the forum as "GM Customer Care Agents."[10]

87. GM engaged in precisely that conduct with respect to the Oil Cooler Defect alleged here. On November 11, 2023, the owner of a 2024 GMC Sierra 3500HD Denali equipped with the L5P Duramax reported on GM-Trucks.com an

---

[10] *See* GMCustomerService Profile, GM-Trucks.com (showing account joined Apr. 5, 2011 and more than 3,000 posts), https://www.gm-trucks.com/forums/profile/92340-gmcustomerservice/ (last visited Sept. 4, 2026); *New GM Customer Care Agents Say Hello*, GM-Trucks.com (Jan. 9, 2014) (posting by GMCustomerService identifying the individuals operating the account as "GM Customer Care Agents" and stating that they would interact with and assist forum members), https://www.gm-trucks.com/forums/topic/156767-new-gm-customer-care-agents-say-hello/ (last visited Sept. 4, 2026).

engine-oil leak and specifically questioned whether the oil cooler was responsible. On November 16, 2023, GM Customer Service responded to the posting and requested that the owner provide GM his contact information, VIN, description of the concern, and preferred GM dealership so that GM could investigate the condition. On November 28, 2023, the owner reported that the dealer had confirmed that the oil cooler was leaking and that replacement parts were on backorder with no estimated availability. GM Customer Service subsequently continued participating in that same discussion concerning oil leaks. Thus, GM was not merely capable of monitoring public owner forums; its own Customer Care personnel actually encountered and responded to a report concerning a premature oil-cooler failure in a 2024 L5P Class Vehicle by November 2023.[11]

88. The timing of the aforementioned complaints, coupled with the other means through which GM monitors vehicle performance, clearly establish that GM had knowledge of the Defect prior to the time of sale of all Class Vehicles.

89. In sum, as early as November 2023, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles, GM was

---

[11] *See 2024 3500 Oil Leak*, GM-Trucks.com (Nov. 11, 2023–Jan. 2024) (2024 GMC Sierra 3500HD Denali L5P owner reporting suspected oil-cooler leak; GMCustomerService responding Nov. 16, 2023 and requesting the owner's contact information, VIN, description of concern, and preferred dealership for investigation; owner reporting Nov. 28, 2023 that dealer confirmed oil-cooler leak and parts were backordered), https://www.gm-trucks.com/forums/topic/265097-2024-3500-oil-leak/ (last visited Sept. 4, 2026).

aware of the Defect and should have been aware through the exercise of reasonable care, and/or was negligent in failing to be aware of the Defect, based on, among others, the following sources:

a. Pre-release design, manufacturing, engineering, and testing data;

b. Service bulletins sent by GM to its dealerships evincing knowledge of ongoing issues with Oil Coolant Systems in the Class Vehicles;

c. Detailed data gathered by GM about large number of Defect repairs;

d. Knowledge GM had of the large number of replacement Oil Coolant System parts ordered from GM;

e. Numerous and consistent consumer complaints made directly to GM about the Oil Cooler Defect;

f. Numerous and consistent consumer complaints collected by NHTSA ODI about the Defect;

g. Numerous and consistent consumer complaints made on online vehicle owner forums; and

h. GM service center employees' familiarity with and knowledge of the Oil Cooler Defect.

90. Moreover, the large number and consistency of Class Member complaints concerning the Oil Cooler Defect underscore its materiality to reasonable consumers. As reflected in these complaints, manifestation of the Oil Cooler Defect can rapidly deplete the engine's supply of lubricating oil, contaminate the engine oil and cooling systems and their components, and deprive critical engine components of necessary lubrication. These conditions can result in overheating, loss of engine power, engine seizure, and sudden and catastrophic engine failure, including while a Class Vehicle is being driven. The risk that the Oil Cooler Defect could cause a sudden loss of motive power or engine failure during operation presents a material safety concern that would be important to a reasonable consumer in deciding whether to purchase or lease a Class Vehicle.

## V. <u>APPLICABLE WARRANTIES</u>

91. GM sold and leased the Class Vehicles with a written New Vehicle Limited Warranty. For model-year 2024 through 2026 Class Vehicles, GM provides bumper-to-bumper coverage for three years or 36,000 miles, whichever occurs first. In addition, Chevrolet Silverado 2500HD/3500HD and GMC Sierra 2500HD/3500HD trucks equipped with the 6.6L Duramax Turbo-Diesel engine receive substantially longer Powertrain Component Coverage for five years or 100,000 miles, whichever occurs first. Thus, expiration of the 3-year/36,000-mile bumper-to-bumper warranty does not terminate warranty protection for covered

Duramax powertrain components. GM's New Vehicle Limited Warranties expressly "cover[ ] repairs to correct any vehicle defect" and state that repairs will be done within a "reasonable time."

92. GM's New Vehicle Limited Warranty promises to repair defects related to materials or workmanship occurring during the applicable warranty period. GM further represents that covered warranty repairs, including parts and labor, will be performed at no charge and that a reasonable time must be allowed for GM's authorized dealer to perform the necessary repairs.

93. GM expressly includes the engine oil cooler within the extended Duramax powertrain warranty. Under the heading "Diesel Components Coverage," GM's warranty identifies among the covered components the cylinder block and heads, all internally lubricated parts, oil pump assembly, seals and gaskets, fuel injection control module, and the ***"integral oil cooler."*** Accordingly, the engine oil cooler in the Class Vehicles is not merely subject to the 3-year/36,000-mile bumper-to-bumper warranty, but is a specifically identified diesel powertrain component covered for five years or 100,000 miles, whichever occurs first. GM's 2024, 2025, and 2026 warranty materials contain this same extended Duramax coverage and expressly identify the integral oil cooler as a covered component. GM also provides an express written warranty with all GM "Original Equipment" replacement parts. The component parts of the Oil Coolant System are

covered by GM's "Limited Lifetime Parts Warranty," which promises that GM will repair or replace, free of all charges except labor, any covered part that was originally installed by a GM dealership at the consumer's expense.

94. GM's own service instructions further confirm that the oil-cooler contamination condition alleged here may be repaired under Powertrain coverage. In Service Bulletin 25-NA-052, GM instructs technicians that engine oil found in the coolant may be caused by a leaking engine oil cooler and directs replacement of the cooler and extensive flushing and replacement of contaminated cooling-system components. In the Bulletin's warranty instructions, GM expressly directs dealers that, ***"[f]or vehicles repaired under the Powertrain coverage,"*** they are to use Labor Operation 4089458, "Coolant Flush to Remove Oil from Cooling System."

95. The extended Powertrain coverage is particularly significant because the Oil Cooler Defect may manifest after the 3-year/36,000-mile bumper-to-bumper period but well within the five-year/100,000-mile Duramax Powertrain warranty. Thus, a Class Vehicle does not cease to have warranty protection for an oil-cooler failure merely because it has exceeded 36,000 miles. Moreover, when failure of the warranted oil cooler deprives the engine of lubrication and damages other covered engine components, including internally lubricated components, GM's warranty obligations are not necessarily limited to replacing the cooler itself.

Plaintiff alleges that GM nevertheless has denied or limited warranty coverage for consequential engine damage caused by the failure of the covered oil cooler, leaving Class Members responsible for repairs costing tens of thousands of dollars.

96. GM also offers warranty protection to purchasers of qualifying Chevrolet, Buick, and GMC Certified Pre-Owned vehicles. GM's Certified Pre-Owned program provides a 12-month/12,000-mile Bumper-to-Bumper Limited Warranty in addition to any remaining original bumper-to-bumper coverage and extends Powertrain Limited Warranty coverage to six years or 100,000 miles from the vehicle's original in-service date, with no deductible for warrantable powertrain repairs required because of defects in material or workmanship.

97. GM also provides a separate written warranty for GM Genuine Parts purchased as service-replacement components. GM's present listing for the replacement engine oil cooler used in the Class Vehicles, Part No. 12738896, provides a 24-month/unlimited-mile limited parts warranty, including labor when installed by a GM dealer. The replacement-part warranty therefore supplies additional warranty protection when a consumer pays to have a replacement cooler installed.

## VI. GM’S MARKETING AND CONCEALMENT

98. Upon information and belief, GM knowingly marketed and sold/leased the Class Vehicles with the Oil Cooler Defect, while willfully

concealing the true inferior quality and sub-standard performance of the Class Vehicles' Coolant Systems.

99. GM directly markets the Class Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the Internet, billboards, print publications, mailings, and through other mass media.

100. GM's marketing material describes the various Class Vehicles as "reliable" and "durable."

101. In practice, the Class Vehicles are not as reliable as GM's marketing suggests. GM concealed the fact that the engine oil coolers installed in the Class Vehicles are prone to prematurely crack or otherwise fail during normal and foreseeable operation. When the Oil Cooler Defect manifests, engine oil can rapidly escape from the lubrication system into the engine cooling system and/or outside the Vehicle, depleting the engine's supply of lubricating oil, contaminating cooling-system components, depriving critical engine components of necessary lubrication, and resulting in overheating, loss of engine power, engine seizure, or catastrophic engine failure.

102. Plaintiffs and Class Members were exposed to GM's long-term, national, multimedia marketing campaign touting the supposed quality and safety of the Class Vehicles, and Class Members justifiably made their decisions to

purchase or lease their Class Vehicles based on GM's misleading marketing that concealed the true, defective nature of the Class Vehicles.

103. Further, GM knowingly misled Class Members about the true, defective nature of the Class Vehicles. As detailed above, upon information and belief, GM has been aware of the Oil Cooler Defect since at least November of 2023, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles, through pre-release evaluation and testing; investigations resulting in TSBs; the high number of Oil Coolant System repairs and replacement part sales; and the numerous and consistent complaints about the Defect made directly to GM, collected by NHTSA, and posted in public online forums.

104. In sum, GM has actively concealed the existence and nature of the Oil Cooler Defect from Class Members since at least November of 2023 despite its knowledge of the existence and pervasiveness of the Oil Cooler Defect. Specifically, GM has:

a. Failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Class Vehicles, including the Oil Cooler Defect;

b. Failed to disclose, at and after the time of purchase, lease, and/or service, that the Class Vehicles' Oil Coolant Systems were defective and not fit for their intended purposes;

c. Failed to disclose, and actively concealed, the fact that the Class Vehicles' Oil Coolant Systems were defective, despite that GM learned of the Defect as early as November 2023, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles;

d. Failed to disclose, and actively concealed, the existence and pervasiveness of the Defect even when directly asked about it by Class Members during communications with GM, GM Customer Care, GM dealerships, and GM service centers;

e. Actively concealed the Defect by forcing Class Members to bear the cost of temporary "fixes" while at the same time performing those "fixes" at no (or lower) cost for those who complained vocally and often, and calling these "goodwill" services; and

f. Actively concealed the Defect by consistently treating the Oil Coolant System failures with temporary "fixes," so that the Defect is not effectively corrected, even though Class Members were led to believe that the "fixes" had cured the Defect.

105. By engaging in the conduct described above, GM has concealed, and continues to conceal, the Defect from Class Members. If Class Members had had knowledge of the information GM concealed, they would not have purchased or leased the Class Vehicles or would have paid less to do so.

## VII. FRAUDULENT CONCEALMENT ALLEGATIONS

106. Absent discovery, Plaintiff is unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at GM responsible for disseminating false and misleading marketing materials regarding the Class Vehicles. GM necessarily is in possession of all of this information. Plaintiff's claims arise out of GM's fraudulent concealment of the Oil Cooler Defect, and its representations about the quality, safety, and comfort of the Class Vehicles. To the extent that Plaintiff's claims arise from GM's fraudulent concealment, there is not one document or communication, and no one interaction, upon which Plaintiff bases his claims. Plaintiff alleges that at all relevant times, including specifically at the time he purchased or leased his Class Vehicle, GM knew, or was reckless in not knowing, of the Defect; GM was under a duty to disclose the Defect based upon its exclusive knowledge of it, and its concealment of it; and GM never disclosed the Defect to Plaintiff or the public at any time or place or in any manner.

107. Plaintiff makes the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to GM:

a. ***Who***: GM actively concealed the Oil Cooler Defect from Plaintiff and Class Members while simultaneously touting the safety, comfort,

sophistication, and quality of the Class Vehicles, as alleged in the preceding paragraphs. Plaintiff is unaware of, and therefore unable to identify, the true names and identities of those specific individuals at GM responsible for such decisions.

b. ***What***: GM knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Oil Cooler Defect, as alleged in the preceding paragraphs. GM concealed the Defect and made representations about the safety, world-class quality, and other attributes of the Class Vehicles, as specified above in the preceding paragraphs.

c. ***When***: GM concealed material information regarding the Defect at all times and made representations about the quality and safety of the Class Vehicles, starting no later than November 2023, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day, as alleged above in the preceding paragraphs. GM still has not disclosed the truth about the Defect in the Class Vehicles to anyone outside of GM. GM has never taken any action to inform consumers about the true nature of the Defect in Class Vehicles. And when consumers brought their Vehicles to GM complaining of the Oil Coolant System failures, GM denied any knowledge of or responsibility for the Defect.

d. ***Where***: GM concealed material information regarding the true nature of the Defect in every communication it had with Plaintiff and Class Members and made representations about the quality, safety, and comfort of the Class Vehicles. Plaintiff is aware of no document, communication, or other place or thing, in which GM disclosed the truth about the Defect in the Class Vehicles to anyone outside of GM. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on GM's website.

e. ***How***: GM concealed the Defect from Plaintiff and Class Members and made representations about the quality and safety of the Class Vehicles. GM actively concealed the truth about the existence and nature of the Defect from Plaintiffs and Class Members at all times, even though it knew about the Defect and knew that information about the Defect would be important to a reasonable consumer, and GM promised in its marketing materials that Class Vehicles have qualities that they do not have.

f. ***Why***: GM actively concealed material information about the Defect in the Class Vehicles for the purpose of inducing Plaintiff and Class Members to purchase and/or lease Class Vehicles, rather than purchasing or leasing competitors' vehicles and made representations about the quality and safety of the Class Vehicles. Had GM disclosed the truth, for example in its

advertisements or other materials or communications, Plaintiff and Class Members (all reasonable consumers) would have been aware of it, and would not have bought or leased the Class Vehicles or would have paid less for them.

## VIII. TOLLING OF STATUTES OF LIMITATIONS

### A. Fraudulent Concealment Tolling

108. Upon information and belief, GM has known of the Oil Cooler Defect in the Class Vehicles since at least November 2023, and certainly well before Plaintiff and Class Members purchased or leased their Class Vehicles, and yet has concealed from or failed to notify Plaintiff, Class Members, and the public of the full and complete nature of the Defect. GM continues to conceal the Defect to this day.

109. Any applicable statute of limitation has been tolled by GM's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### B. Estoppel

110. GM was and is under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the Class Vehicles. GM actively concealed—and continues to conceal—the true character, quality, and nature of the Class Vehicles and knowingly made representations about the world-class quality, sophistication, state-of-the-art safety, and comfort of the Class

Vehicles. Plaintiff and Class Members reasonably relied upon GM's knowing representations and active concealment of these facts. Based on the foregoing, GM is estopped from relying on any statutes of limitation in defense of this action.

### C. **Discovery Rule**

111. The causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that their Class Vehicles contained the Oil Cooler Defect.

112. Plaintiff and Class Members had no realistic ability to discover the Oil Cooler Defect before it manifested because the defective oil cooler is an internal mechanical component whose susceptibility to premature cracking or failure is not apparent to consumers through reasonable inspection. When the Oil Cooler Defect manifests, the oil cooler can crack or otherwise fail suddenly and without meaningful advance warning, allowing engine oil to escape into the engine cooling system and/or outside the Vehicle, rapidly depleting the engine's supply of lubricating oil, contaminating cooling-system components, depriving critical engine components of necessary lubrication, and causing overheating, loss of engine power, engine seizure, or catastrophic engine failure. Even after experiencing such a failure, Plaintiff and Class Members had no reason to know that it resulted from a common defect in the engine oil coolers installed in the

Class Vehicles because GM failed to disclose and actively concealed the Oil Cooler Defect.

113. Plaintiff and Class Members could not reasonably have discovered the Oil Cooler Defect before purchasing or leasing their Class Vehicles, despite the exercise of due diligence, because the Defect involves an internal mechanical component and is not apparent through reasonable inspection. Their causes of action did not accrue until they discovered, or reasonably could have discovered, that the oil-cooler failures and resulting oil loss, contamination, and engine damage experienced in their Vehicles were attributable to the Oil Cooler Defect alleged herein.

## IX. CHOICE OF LAW ALLEGATIONS

114. GM is headquartered in Detroit, Michigan. In January 2026, GM opened its new global headquarters at Hudson's Detroit, 1240 Woodward Avenue in downtown Detroit. GM has maintained its global headquarters in Detroit for more than a century and describes Detroit as the "beating heart of General Motors."[12]

---

[12] General Motors, *U.S. Operations: Fueling America's Economy* (identifying Hudson's Detroit, 1240 Woodward Avenue, Detroit, Michigan, as GM's global headquarters and stating that the facility opened in 2026) https://www.gm.com/company/us-operations (last visited September 4, 2026); General Motors, *General Motors' New Home in Detroit* (Jan. 12, 2026) (describing GM's relocation of its global headquarters to Hudson's Detroit and its longstanding headquarters presence in

*Footnote continued on next page*

115. GM's presence in Michigan extends far beyond its corporate headquarters. GM identifies itself as Michigan's largest automotive employer and reports approximately 50,000 employees in Michigan, 38 facilities, including five assembly plants, approximately 210 GM dealers, and more than 1,000 Tier 1 supplier locations throughout the State. GM further reports that it directly contributed more than $29 billion to Michigan's economy in 2024 and invested approximately $17.3 billion in Michigan during the preceding decade.[13]

116. Michigan is also a principal center of GM's vehicle engineering and product-development activities. GM's Global Technical Center in Warren, Michigan is a 710-acre campus employing more than 21,000 employees, including groups responsible for engineering, design, and advanced technology. GM also conducts product-development and durability testing at its Milford Proving Ground in Michigan, as alleged above.[14]

---

Detroit)https://news.gm.com/home.detail.html/Pages/news/us/en/2026/jan/0112-General-Motors-new-home-Detroit.html (last visited Sept. 4, 2026).

[13] General Motors, *GM Announces $50 Million Commitment to Support Michigan Through 2030* (May 26, 2026) (stating that GM has nearly 50,000 employees in Michigan)https://news.gm.com/home.detail.html/Pages/topic/us/en/2026/may/0526-50-million-commitment-michigan-2030.html(last visited Sept. 4, 2026); General Motors, *General Motors' New Home in Detroit* (Jan. 12, 2026) (identifying GM's Michigan presence as including 38 facilities, five assembly plants, approximately 210 dealers and more than 1,000 Tier 1 supplier locations, and reporting more than $29 billion in direct contribution to Michigan's economy in 2024 and $17.3 billion invested in Michigan during the preceding decade) https://news.gm.com/home.detail.html/Pages/news/us/en/2026/jan/0112-General-Motors-new-home-Detroit.html (last visited Sept. 4, 2026).

[14] General Motors, *U.S. Operations: Fueling America's Economy* (describing GM's

*Footnote continued on next page*

117. GM also manufactures Class Vehicles in Michigan. GM's Flint Assembly facility manufactures Chevrolet Silverado HD and GMC Sierra HD trucks, including vehicles equipped with the L5P Duramax engine at issue here. GM describes Flint Assembly as its longest-running North American assembly plant and as the home of its heavy-duty Chevrolet and GMC pickups. Some Chevrolet Silverado HD configurations also are manufactured at GM's Oshawa, Ontario facility.[15]

118. GM maintains substantial Customer Care and Aftersales operations in Michigan as well. GM describes its Customer Care and Aftersales organization as responsible for customer support and post-sale services including warranty administration, vehicle service, recall support, technical information, dealer-part operations, and the supply and distribution of replacement parts. GM maintains

---

Global Technical Center in Warren, Michigan as a 710-acre campus with more than 21,000 employees and groups focused on engineering, design, and advanced technology) https://www.gm.com/company/us-operations(last visited Sept. 4, 2026).; General Motors, *GM Quality, Durable, and Reliable Vehicles* (identifying the Milford Proving Ground in Milford, Michigan as responsible for product development and durability testing) https://www.gm.com/company/gm-quality-standards (last visited Sept. 4, 2026).

[15] General Motors, *Every GM Assembly Plant Currently Operating in the U.S.* (July 28, 2026) (identifying Flint Assembly in Flint, Michigan as producing Chevrolet Silverado HD and GMC Sierra HD trucks) https://news.gm.com/home.detail.html/Pages/topic/us/en/2026/jul/0728-assembly-plant.html(last visited Sept. 4, 2026); General Motors Canada, *Oshawa Assembly* (identifying Oshawa Assembly as producing Chevrolet Silverado heavy-duty and light-duty pickups) https://www.gm.ca/en/home/company/canada/oshawa.html (last visited Sept. 4, 2026).

Customer Care and Aftersales facilities in Michigan, including parts-processing and distribution operations serving GM dealers.[16]

119. On information and belief, the conduct giving rise to Plaintiff's claims was substantially centralized in Michigan. This conduct includes GM's engineering, testing, and validation of the Class Vehicles and their component systems; its evaluation of field and warranty data concerning the Oil Cooler Defect; decisions concerning the issuance and content of service updates and technical service bulletins; development of warranty and repair protocols; and decisions concerning what information regarding the Oil Cooler Defect would be disclosed to dealers, customers, and the public.

120. On information and belief, GM personnel located in Michigan participated in or supervised the investigation of the Oil Cooler Defect and the development and implementation of GM's response to the Defect, including warranty administration, dealer repair instructions, customer communications, and

[16] General Motors, *CCA Flint General Supervisor* (Aug. 21, 2026) (describing GM's Customer Care and Aftersales organization as providing customer support and post-purchase services, including vehicle parts, service, recall and warranty support, and managing GM's service-parts supply chain) https://search-careers.gm.com/en/jobs/jr-202617599/cca-flint-general-supervisor/; General Motors, *Sr. Systems Analyst—Dealer Parts, Service & Warranty* (July 16, 2026) (identifying Warren, Michigan as a work location and describing CCA functions including warranty administration, warranty claims and labor-time systems, dealer technical support, service information, diagnostics, and dealer-parts operations) https://search-careers.gm.com/en/jobs/jr-202614035/sr-systems-analyst-dealer-parts-service-warranty/ (last visited Sept. 4, 2026).

replacement-part policies. The precise identities and locations of those personnel, and the extent to which these functions were centralized in Michigan, are matters within GM's exclusive possession and control and will be established through discovery.

121. The conduct alleged in this action therefore is not connected to Michigan merely because GM happens to be headquartered there. Michigan is the location of GM's global headquarters and major engineering, product-development, durability-testing, manufacturing, warranty, customer-care, and aftersales operations, and is a location from which, on information and belief, material portions of GM's nationwide conduct concerning the Class Vehicles and the Defect originated or were coordinated.

122. Michigan has a substantial interest in regulating allegedly unlawful conduct occurring within Michigan and in regulating the conduct of a corporation headquartered in Michigan where the challenged engineering, testing, warranty, disclosure, and remedial decisions were made or coordinated in substantial part within the State.

123. Under Michigan choice-of-law principles, Michigan law applies unless there is a rational reason to displace it. Where another State possesses an interest in application of its law, the Court considers that interest together with Michigan's interests in regulating the conduct at issue. Plaintiff alleges that

Michigan's substantial relationship to GM and to the common course of conduct alleged herein supports application of Michigan law to the Nationwide Class claims for which Michigan law is invoked.[17]

124. As an alternative to the application of Michigan law to the Nationwide Class (as defined below), the Court can and should apply the laws of the state of Idaho to that State Class members' claims.

## X. CLASS ALLEGATIONS

125. Plaintiff brings this lawsuit as a class action on behalf of himself and all other Class Members similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), (b)(3), and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

126. As alleged throughout this Complaint, the Class's claims all derive directly from a single course of conduct by GM. This case is about the responsibility of GM, at law and in equity, for its knowledge, its conduct, and its products. GM has engaged in uniform and standardized conduct toward the Class. It did not differentiate, in its degree of care or candor, its actions or inactions, or in

---

[17] *Sutherland v. Kennington Truck Service, Ltd.*, 454 Mich. 274, 286, 562 N.W.2d 466 (1997) ("[W]e will apply Michigan law unless a 'rational reason' to do otherwise exists." In determining whether such a reason exists, the court first determines whether another state has an interest in application of its law and, if so, determines whether Michigan's interests nevertheless mandate application of Michigan law.).

the content of its statements or omissions, among individual Class members. The objective facts on these subjects are the same for all Class members. Within each cause of action asserted by the respective Classes, the same legal standards govern.

127. Pursuant to Rules 23(a); (b)(2); and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action and seek to certify and maintain it as a class action on behalf of themselves and a Nationwide Class, as defined below, or, in the alternative, for statewide State Classes, as defined below.

128. Plaintiffs seek a Nationwide Class (or State Classes) for damages under Rule 23(b)(3) for those Class Members who have paid out-of-pocket for Oil Coolant System repairs.

129. Plaintiffs seek a Nationwide Class (or State Classes) for declaratory relief under Rule 23(b)(2) for those whose Oil Cooler Defect has not yet manifested.

**A. <u>The Nationwide Class</u>**

130. For the purpose of the below class definition, “Class Vehicles” means model-year 2024 through 2026 Chevrolet Silverado 2500HD and 3500HD and GMC Sierra 2500HD and 3500HD vehicles equipped with the 6.6-liter L5P Duramax Turbo-Diesel V8 engine, together with model-year 2027 versions of those vehicles to the extent they are equipped with the same or substantially similar L5P engine-oil-cooler assembly or design alleged herein. Plaintiff reserves the

right to amend the definition of Class Vehicles based upon discovery concerning the production dates, part numbers, engineering revisions, and oil-cooler assemblies used in model-year 2027 vehicles.

131. The Nationwide Class is initially defined as follows:

> All persons or entities in the United States that purchased or leased a Class Vehicle, other than for purposes of resale.

**B. <u>The State Classes</u>**

132. In the alternative to the Nationwide Class, Plaintiffs allege statewide class action claims on behalf of state-wide classes for certain states ("State Classes"). Each of these State Classes is initially defined as follows:

> **<u>Idaho Class</u>**
> All persons or entities in Idaho that purchased or leased a Class Vehicle.

133. The Nationwide Class and the State Classes and their members are sometimes referred to herein as the "Class" or "Classes."

134. Excluded from the proposed Class are: (1) GM, any entity or division in which GM has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's immediate family and staff; (3) governmental entities; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class definition if discovery and further

investigation reveal that the Class should be expanded, otherwise divided into subclasses, or modified in any other way.

**C. Numerosity**

135. Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in GM's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

**D. Typicality**

136. Plaintiff's claims are typical of the claims of Class Members in that Plaintiff, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, marketed, distributed, warranted, sold/leased, and serviced by GM. Plaintiff, like all Class Members, has been damaged by GM's misconduct in that he purchased/leased a Vehicle he would not have purchased/leased, or would not have purchased/leased at the price paid, and incurred or will incur the cost of repairs relating to and caused by the Oil Cooler Defect. Furthermore, the factual bases of GM's misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members.

**E. Adequate Representation**

137. Plaintiff will fairly and adequately represent and protect the interests of the Class Members. Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions, including actions involving Class Vehicles.

138. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of Class Members and have the financial resources to do so. Neither Plaintiff nor their counsel have interests adverse to those of Class Members.

**F. Predominance of Common Issues**

139. There are numerous questions of law and fact common to Plaintiff and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include:

a. whether the Oil Coolant System in the Class Vehicles is defective;

b. whether GM knew or should have known about the Oil Cooler Defect, and, if yes, how long GM has known of the Defect;

c. whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase or lease a Class Vehicle;

d. whether GM had a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class Members;

e. whether GM omitted and failed to disclose material facts about the Class Vehicles;

f. whether GM's concealment of the true defective nature of the Class Vehicles induced Plaintiff and Class Members to act to their detriment by purchasing or leasing Class Vehicles;

g. whether GM's representations and omissions about the true defective nature of the Class Vehicles were likely to mislead or deceive, and therefore fraudulent;

h. whether GM's representations and omissions about the true defective nature of the Class Vehicles were and are unfair;

i. whether GM represented, through its words and conduct, that the Class Vehicles had characteristics, uses, or benefits that they did not actually have;

j. whether GM represented, through its words and conduct, that the Class Vehicles were of a particular standard, quality, or grade when they were of another;

k. whether GM advertised the Class Vehicles with the intent not to sell/lease them as advertised;

l. whether GM's representations and omissions about the true defective nature of the Class Vehicles were likely to create confusion or misunderstanding;

m. whether GM's representations and omissions about the true defective nature of the Class Vehicles were and are deceptive;

n. whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

o. whether Plaintiff and the other Class Members are entitled to a declaratory judgment stating that the Oil Coolant Systems in Class Vehicles are defective and/or not merchantable;

p. whether Plaintiff and the other Class Members are entitled to declaratory relief establishing that the Class Vehicles are defective because their engine oil coolers are prone to prematurely crack or otherwise fail, allowing engine oil to escape into the engine cooling system and/or outside the Vehicle, thereby depleting the engine's supply of lubricating oil, contaminating cooling-system components, depriving critical engine components of necessary lubrication, and potentially causing overheating, loss of engine power, engine seizure, and/or catastrophic engine failure; whether the Oil Cooler Defect may manifest after the expiration of GM's applicable warranty periods; and whether the Oil Cooler Defect

and its associated risks and consequences are material facts that GM was obligated to disclose to Plaintiff and Class Members.

q. whether Plaintiff and the other Class Members are entitled to a declaratory judgment stating that all Class Members are to be provided the best practicable notice of the defect, which cost shall be borne by GM.

r. whether Plaintiff and the other Class Members are entitled to a declaratory judgment stating that the Class Vehicles contain the Defect; that GM's five-year/100,000-mile Duramax Powertrain Limited Warranty expressly covers the integral engine oil cooler and other covered powertrain components damaged as a result of its failure; that GM may not deny or limit warranty coverage for an oil-cooler failure or resulting damage to covered engine and powertrain components based upon expiration of the three-year/36,000-mile bumper-to-bumper warranty; and that, because the Oil Cooler Defect is latent, existed at the time of sale or lease, and was known or should have been known to GM before sale, any otherwise applicable durational limitation may not be enforced to bar relief for the Defect where doing so would deprive Class Members of an effective remedy for the defect. Plaintiff further seeks a declaration requiring GM to provide appropriate notice to Class Members and to honor, re-evaluate, and pay qualifying warranty claims for the Defect and resulting covered powertrain damage.

s. whether Plaintiff and the other Class Members are entitled to a declaratory judgment stating that GM shall re-audit and reassess all prior warranty claims, including claims previously denied in whole or in part, where the denial was based on warranty or on other grounds, of claims related to the Oil Coolant Defect in the Class Vehicles.

t. whether Plaintiff and the other Class Members are entitled to a declaratory judgment stating that GM shall establish a repair program and protocol to be communicated to class members, which will require GM to inspect, upon request, a class member's vehicle to determine whether the Defect is manifest. Any disputes over coverage shall be adjudicated by a Special Master appointed by the Court and/or agreed to by the parties.

**G. <u>Superiority</u>**

140. Plaintiff and Class Members have all suffered and will continue to suffer harm and damages as a result of GM's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

141. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims (compared to the cost of litigation), it is likely that only a few

Class Members could afford to seek legal redress for GM's misconduct. Absent a class action, Class Members will continue to incur damages, and GM's misconduct will continue without remedy.

142. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

## XI. CAUSES OF ACTION

### A. NATIONWIDE CLASS CLAIMS

### FIRST CAUSE OF ACTION

### BREACH OF WRITTEN WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT

143. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

144. Plaintiff brings this Count on behalf of members of the Nationwide Class who are residents of all fifty states and Washington D.C.

145. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

146. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

147. Plaintiff and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers

because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

148. GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

149. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

150. GM's New Vehicle Limited Warranty, including its Duramax Powertrain Component Coverage, constitutes a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

151. GM breached the express warranties by:

a. Providing purchasers and lessees of Class Vehicles with a New Vehicle Limited Warranty that includes three-year/36,000-mile bumper-to-bumper coverage and, for Class Vehicles equipped with the 6.6-liter Duramax diesel engine, five-year/100,000-mile Powertrain Component Coverage. GM's Duramax Powertrain Component Coverage expressly identifies the **integral oil cooler** as a covered component and also covers other engine and powertrain components, including internally lubricated engine parts;

b. Selling and leasing Class Vehicles with the Defect, and which thus were defective in materials and/or workmanship, requiring repair or replacement within the warranty period;

c. Refusing and/or failing to honor the express warranties by effectively repairing or replacing the defective Oil Coolant Systems free of charge and within a reasonable time; and

d. Providing repairs that did not effectively remedy the Oil Cooler Defect, delaying covered repairs because necessary replacement components were unavailable, and/or otherwise failing to restore Class Vehicles to a warrantable condition within a reasonable time.

152. GM provided Plaintiff and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, GM warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled. Mich. Comp. Laws § 440.2314(2)(a), (c), and (e); U.C.C. § 2-314.

153. GM breached these implied warranties, as described in more detail above, and are therefore liable to Plaintiff and the Class pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share common design defects in that they are equipped with defective Oil Coolant Systems that can suddenly fail during normal use and operation.

154. In its capacity as a warrantor, as GM had knowledge of the inherent defects in the Class Vehicles, any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

155. The limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between GM and Plaintiff and the other Class members, as, at the time of purchase and lease, Plaintiff and the other Class members had no other options for purchasing warranty coverage other than directly from GM.

156. The limitations on the warranties are substantively unconscionable. GM knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. GM failed to disclose these defects to Plaintiff and the other Class members. Thus, GM's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

157. Plaintiff and each of the other Class members have had sufficient direct dealings with GM to establish privity of contract. Nonetheless, privity is not required here because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between GM and its dealers, and specifically, of the implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers.

158. Pursuant to 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this class action and is not required to give GM notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure.

159. Furthermore, affording either GM an opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Class Vehicle, GM knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff resort to an informal dispute resolution procedure and/or afford GM a

reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

160. Plaintiff and the other Class Members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because GM is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiff and the other Class Members have not re-accepted their Class Vehicles by retaining them.

161. As a direct and proximate cause of GM's breach of the written warranties, Plaintiff and the other Class members sustained damages and other losses in an amount to be determined at trial. GM's conduct damaged Plaintiff and the other Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, and costs, including statutory attorneys' fees, and/or other relief as deemed appropriate.

162. The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiff, individually and on behalf of the other Class Members, seeks all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and the other Class Members are entitled to recover a

sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiff and the other Class Members in connection with the commencement and prosecution of this action.

163. Further, Plaintiff and the Class are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1). Plaintiff also seeks available declaratory relief. Based on GM's continuing failures to fix the known defects, Plaintiff seeks declarations that:

a. The Class Vehicles are defective in that their Oil Coolant Systems crack, leak engine oil, deprive the engine of oil, contaminate cooling-system components, and cause engine damage and/or failure. In some instances, the Defect may not manifest until after the warranty provided by GM has expired. The Oil Coolant System is material and requires disclosure to all Class Members.

b. All Class Members are to be provided the best practicable notice of the defect, which cost shall be borne by GM.

c. Because the Class Vehicles contain the Defect, and because GM knew or should have known of the Defect before the time of sale or lease, GM may not rely on its written warranty limitations to avoid responsibility for the Defect where doing so would deprive Class Members of an effective remedy for a latent defect existing at the time of sale. In particular, GM's five-year/100,000-

mile Duramax Powertrain Component Coverage expressly covers the integral engine oil cooler and other covered powertrain components damaged as a result of its failure. GM therefore may not deny or limit coverage for an oil-cooler failure, or resulting damage to covered engine or powertrain components, based solely on expiration of the three-year/36,000-mile bumper-to-bumper warranty. To the extent GM seeks to enforce any otherwise applicable durational limitation to bar relief for the knowingly concealed the Defect, Plaintiff seeks a declaration that such limitation is unenforceable as applied to the Defect, together with appropriate notice to affected Class Members and reconsideration of qualifying warranty claims previously denied or limited on that basis. GM shall re-audit and reassess all prior warranty claims, including claims previously denied in whole or in part, where the denial was based on warranty or on other grounds, of claims related to the Oil Cooler Defect in the Class Vehicles.

d. GM shall establish a repair program and protocol to be communicated to class members, which will require GM to inspect, upon request, a class member's vehicle to determine whether the Defect is manifest. Any disputes over coverage shall be adjudicated by a Special Master appointed by the Court and/or agreed to by the parties.

164. Plaintiff also requests, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs they have incurred in attempting

to rectify the Defect in their vehicles. Such expenses and losses will continue as Plaintiff and Class Members must take time off from work, pay for rental cars or other transportation arrangements, child care, and the myriad expenses involved in going through the repair process.

165. The right of Class Members to recover these expenses as an equitable matter to put them in the place they would have been but for GM's conduct presents common questions of law. Equity and fairness requires the establishment by Court decree and administration under Court supervision of a program funded by GM, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

## SECOND CAUSE OF ACTION

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (MICH. COMP. LAWS § 440.2314)

166. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

167. This claim is brought on behalf of the Nationwide Class for breach of implied warranty under Michigan law.

168. GM were merchants with respect to motor vehicles within the meaning of Mich. Comp. Laws § 440.2314(1).

169. Under Mich. Comp. Laws § 440.2314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Class Members purchased their Class Vehicles.

170. These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that there are defects in the Oil Coolant Systems that cause them to crack, leak engine oil, deprive the engine of oil, contaminate cooling-system components, and cause engine damage or failure.

171. GM was provided notice of these issues through sources such as pre-release evaluation and testing; investigations leading to dealer service bulletins; repair data; replacement part sales data; early consumer complaints made directly to GM, collected by NHTSA ODI, and/or posted on public online vehicle owner forums; complaints filed against them; and by numerous individual letters and communications sent by the Class before or within a reasonable amount of time after GM began its "Special Coverage Program" and the allegations of vehicle defects became public.

172. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and the Class have been damaged in an amount to be proven at trial.

173. Plaintiff also seeks available declaratory relief. Based on GM's continuing failures to fix the known defects, Plaintiff seeks declarations that:

a. The Class Vehicles are defective in that their Oil Coolant Systems crack, leak engine oil, deprive the engine of oil, contaminate cooling-system components, and cause engine damage and/or failure. The Defect may not manifest until after the warranty provided by GM has expired. The Defect is material and requires disclosure to all Class Members.

b. All Class Members are to be provided the best practicable notice of the defect, which cost shall be borne by GM.

c. Because the Class Vehicles were sold or leased with the Defect and were therefore not merchantable at the time of sale or lease, GM may not avoid its implied-warranty obligations merely because the Defect manifested after expiration of an otherwise applicable durational limitation. To the extent GM purports to limit the duration of the implied warranty of merchantability to the duration of any express warranty, such limitation is unconscionable and unenforceable as applied to the Defect because the Defect existed at the time of sale, was not reasonably discoverable by consumers before manifestation, and, as alleged herein, was known or should have been known to GM. Plaintiff accordingly seeks a declaration that GM may not rely upon any such durational limitation to bar otherwise valid implied-warranty claims arising from the Defect.

d. GM shall re-audit and reassess all prior warranty claims, including claims previously denied in whole or in part, where the denial was based on warranty or on other grounds, of claims related to the Defect in the Class Vehicles.

e. GM shall establish a repair program and protocol to be communicated to class members, which will require GM to inspect, upon request, a class member's vehicle to determine whether the Defect is manifest. Any disputes over coverage shall be adjudicated by a Special Master appointed by the Court and/or agreed to by the parties.

## THIRD CAUSE OF ACTION

## FRAUDULENT CONCEALMENT

174. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

175. This claim is brought on behalf of the Nationwide Class under Michigan law.

176. GM concealed and suppressed material facts concerning the Class Vehicles.

177. As described above, GM made material omissions and affirmative misrepresentations regarding the Class Vehicles.

178. GM knew these representations were false when made.

179. GM had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to the Oil Coolant System's cracking, leaking engine oil, depriving the engine of oil, contaminating cooling-system components, and causing engine damage and/or failure, because Plaintiffs relied on GM's representations that the vehicles they were purchasing and retaining were safe and free from defects.

180. The aforementioned concealment was material, because if it had been disclosed Plaintiff and Class Members would not have bought, leased or retained their vehicles.

181. The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. GM intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

182. Plaintiff and Class Members relied on GM's reputation-along with their failure to disclose the Oil Coolant System problems and GM's affirmative assurances that their vehicles were safe and reliable and other similar false statements – in purchasing, leasing or retaining the Class Vehicles.

183. However, GM concealed and suppressed material facts concerning the culture of GM – a culture that emphasized cost-cutting, avoidance of dealing with safety issues and a shoddy design process.

184. Further, GM had a duty to disclose the true facts about the Class Vehicles because they were known and/or accessible only to GM who had superior knowledge and access to the facts, and the facts were not known to or reasonably discoverable by Plaintiff and Class Members. As stated above, these omitted and concealed facts were material because they directly impact the safety, reliability and value of the Class Vehicles. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, is of material concern to a reasonable consumer.

## FOURTH CAUSE OF ACTION

## UNJUST ENRICHMENT

185. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

186. This claim for unjust enrichment is brought on behalf of the Nationwide Class.

187. GM has received and retained a benefit from the Plaintiff and the Nationwide Class, and inequity has resulted.

188. GM benefitted while Plaintiff and Class Members, who originally overpaid for their GM cars, have been forced to pay additional out-of-pocket costs and incur additional expenses and losses in connection with repairs.

189. It is inequitable for GM to retain the benefits of its misconduct.

190. As a result of GM's conduct, the amount of GM's unjust enrichment should be disgorged, in an amount according to proof.

## B. STATE CLASS CLAIMS

### 1. IDAHO

### FIFTH CAUSE OF ACTION

### VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT (Idaho Code Ann. § 48-601, *et seq.*)

191. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

192. Plaintiff Robert Hubof brings this claim on behalf of himself and the Idaho Class.

193. Plaintiff and the Idaho Class Members are "persons" who purchased or leased goods within the meaning of the Idaho Consumer Protection Act ("Idaho CPA") Idaho Code § 48-602 and 48-608.

194. GM is a "person" within the meaning of Idaho CPA § 48-602(1).

195. The Class Vehicles, the Oil Coolant Systems installed in them, are goods or services within the meaning of the Idaho CPA§ 48-602(6) and 48-602(7).

196. GM designed, manufactured, marketed, distributed, warranted, and sold or leased the Class Vehicles through its authorized dealer network in Idaho. GM's acts or practices alleged herein occurred in the conduct of "trade" or "commerce" under Idaho Code § 48-602(2).

197. Plaintiff's and the Idaho Class Members' claims are founded upon their purchase or lease contracts for the Class Vehicles and GM's written warranties. Plaintiff and the Idaho Class members purchased or leased their Class Vehicles from GM-authorized dealers and therefore had, at minimum, the contractual relationship and indirect privity with GM required by the Idaho CPA.

198. Idaho Code § 48-603 declares unlawful unfair methods of competition and unfair or deceptive acts or practices in trade or commerce when a person knows, or in the exercise of due care should know, that the person is engaging in such conduct.

199. GM violated the Idaho CPA by, engaging in unfair, misleading, false, deceptive and unconscionable acts and practices, including, but not limited to, the following:

a. Representing that the Class Vehicles had characteristics, uses, or benefits they did not have, in violation of Idaho Code § 48-603(5);

b. Representing that the Class Vehicles and their Oil Coolant Systems were of a particular standard, quality, or grade when they were of another, in violation of Idaho Code § 48-603(7);

c. Advertising the Class Vehicles as reliable and durable, and as supported by an effective New Vehicle Limited Warranty, with the intent not to sell or lease them as advertised, in violation of Idaho Code § 48-603(9);

d. Failing to disclose and actively concealing the Defect, the risk of sudden Oil Coolant System and engine failure, the absence of an effective repair, and GM's practice of denying or limiting warranty coverage for resulting engine damage, which conduct was otherwise misleading, false, or deceptive to consumers, in violation of Idaho Code § 48-603(17); and

e. Engaging in unconscionable acts or practices by knowingly inducing purchasers and lessees to enter transactions that were excessively one-sided in GM's favor, and by engaging in a pattern of sales conduct that would outrage or offend the public conscience, while shifting the undisclosed risk and extraordinary repair costs of the Defect to consumers, in violation of Idaho Code §§ 48-603(18) and 48-603C(2)(c)-(d).

200. In the course of its business, GM knowingly and willfully failed to disclose and actively concealed the Defect. GM nevertheless represented through its advertising, window stickers, warranty materials, authorized dealers, and other

communications that the Class Vehicles were reliable, durable, fit for their intended use, and protected by an effective warranty.

201. GM knew or, in the exercise of due care, should have known that these representations and omissions were misleading, false, or deceptive. As alleged above, GM acquired knowledge of the Defect through pre-release design, engineering, and durability testing; investigations and service bulletins; warranty and repair data; replacement-part orders; dealer reports; and consumer complaints.

202. The concealed facts were material. A reasonable consumer would consider the existence of the Defect important when deciding whether and at what price to purchase or lease the vehicle.

203. The Defect is located in internal mechanical components and ordinarily cannot be discovered by a reasonable consumer before purchase or lease. GM possessed superior and, before discovery in this action, substantially exclusive knowledge of the Defect and knew that Plaintiff and the Idaho Class lacked reasonable means to discover it.

204. GM intended that Plaintiff and the Idaho Class rely on its representations and omissions so that they would purchase or lease Class Vehicles, pay more for them than they otherwise would have paid, and refrain from demanding an effective repair, refund, replacement, or other relief.

205. Plaintiff and the Idaho Class reasonably relied on GM's uniform representations, omissions, and concealment in purchasing or leasing their Class Vehicles.

206. Had GM disclosed the Defect and its consequences, Plaintiff and the Idaho Class would not have purchased or leased their Class Vehicles or would have paid less for them.

207. As a direct and proximate result of GM's violations, Plaintiff and the Idaho Class suffered ascertainable losses of money or property, including overpayment at the time of purchase or lease, diminished vehicle value, diagnostic and repair expenses, and loss of use.

208. GM's violations were repeated and flagrant, affected numerous Idaho consumers, and continue because GM has not fully disclosed the Defect or provided an effective repair or other adequate remedy.

209. Plaintiff and the Idaho Class therefore seek actual damages or statutory damages as permitted by Idaho Code § 48-608, restitution, injunctive and other equitable relief, costs, reasonable attorneys' fees, and all other relief available under Idaho law.

## SIXTH CAUSE OF ACTION

### FRAUDULENT CONCEALMENT
### (Idaho Common Law)

210. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

211. Plaintiff Robert Hubof brings this claim on behalf of himself and the Idaho Class. This claim is pleaded in the alternative to the Idaho CPA claim to the extent required.

212. GM made affirmative representations and partial disclosures concerning the quality, reliability, durability, safety, Oil Coolant System functionality, and warranty coverage of the Class Vehicles while concealing and failing to disclose the Defect and its consequences.

213. GM's representations and partial disclosures were false or misleading because the Class Vehicles contained the Defect that can cause the oil cooler to crack, leak engine oil, deprive the engine of oil, contaminate cooling-system components, and cause engine damage and/or failure.

214. GM knew that these representations and partial disclosures were false or misleading when made. As alleged above, GM knew of the Defect through pre-release design, engineering, and durability testing; investigations and service bulletins; warranty and repair data; replacement-part orders; dealer reports; and consumer complaints.

215. GM had a duty to disclose the Defect and its material consequences because:

a. Disclosure was necessary to prevent GM's affirmative representations and partial statements concerning the Class Vehicles' quality, durability, reliability, functionality, and warranty protection from being misleading;

b. The Defect was a vital fact known to GM and unknown to Plaintiff and the Idaho Class, GM knew they were acting without knowledge of the Defect, and the Defect was so material to the purchase or lease that full knowledge would have caused them not to enter the transaction or to pay less;

c. GM directly issued written warranties to Plaintiff and the Idaho Class and undertook to administer and perform its warranty obligations through its authorized dealers; and

d. GM possessed superior and substantially exclusive knowledge of the Defect and knew that consumers could not reasonably discover it before purchase or lease.

216. GM did more than remain silent. GM continued to market the Class Vehicles as reliable and durable; failed to disclose the Defect in advertising, window stickers, warranty materials, owner materials, and dealer communications; denied or minimized the Defect and its responsibility when failures occurred;

attributed resulting engine damage to insufficient maintenance; and used or proposed temporary repairs and equally defective replacement parts without disclosing that the underlying Defect remained.

217. Plaintiff pleads the circumstances of GM's concealment with the specificity presently available before discovery as follows:

a. Who: GM, acting through the personnel responsible for vehicle design, testing, engineering, marketing, warranty administration, customer communications, and communications with GM-authorized dealers;

b. What: GM concealed the existence, nature, scope, safety consequences, repair costs, and lack of an effective warranty remedy for the Oil Cooler Defect while representing that the Class Vehicles were reliable, durable, functional, and supported by an effective warranty;

c. When: before the Class Vehicles were first offered for sale or lease, at the time of Plaintiff's and Class Members' purchases or leases, during warranty and repair communications, and continuing to the present;

d. Where: in GM's advertising and marketing, window stickers, warranty and owner materials, point-of-sale communications through GM-authorized dealers, service and repair communications, and communications with GM Customer Care;

e. How: by omitting the Defect from those communications, making incomplete and misleading representations about the Class Vehicles, denying or minimizing the Defect when consumers complained, and concealing that proposed repairs did not provide a permanent remedy; and

f. Why: to induce consumers to purchase or lease Class Vehicles and pay more for them, to preserve GM's sales and reputation, and to avoid the cost of an effective repair program, warranty coverage, replacement, refund, or recall.

218. The facts GM concealed were material. A reasonable consumer would consider a latent defect capable of causing sudden engine failure, rendering a vehicle unusable, and requiring repairs costing tens of thousands of dollars important in deciding whether and at what price to purchase or lease a Class Vehicle.

219. GM intended that Plaintiff and the Idaho Class remain ignorant of the Defect and rely on GM's representations and omissions in deciding to purchase or lease and retain their Class Vehicles.

220. Plaintiff and the Idaho Class did not know, and through reasonable diligence could not have discovered, the concealed facts before purchase or lease because the Defect was latent and located in internal mechanical components and

the relevant design, testing, warranty, repair, and complaint information was controlled by GM.

221. Plaintiff actually and justifiably relied on GM's representations and omissions. Among other things, Plaintiff reviewed advertising and the window sticker, spoke with GM sales representatives, and relied on GM's representations concerning the Vehicle's functionality and New Vehicle Limited Warranty. Plaintiff and the Idaho Class had a right to rely on GM's representations and disclosure of material facts that were not reasonably available to them.

222. Had GM disclosed the truth, Plaintiff and the Idaho Class would not have purchased or leased their Class Vehicles or would have paid less for them.

223. As a direct and proximate result of GM's fraudulent concealment, Plaintiff and the Idaho Class suffered damages in an amount to be proven at trial, including lost benefit of the bargain, overpayment, diminished value, diagnostic and repair expenses, and loss of use.

224. Plaintiff and the Idaho Class therefore seek compensatory damages and all other legal and equitable relief available under Idaho law.

## SEVENTH CAUSE OF ACTION

## BREACH OF EXPRESS WARRANTY
## (Idaho Code §§ 28-2-313 and 28-12-210)

225. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

226. Plaintiff Robert Hubof brings this claim on behalf of himself and the Idaho Class.

227. GM is a merchant and warrantor with respect to the Class Vehicles and designed, manufactured, distributed, marketed, sold or leased, and warranted the Class Vehicles.

228. GM provided purchasers and lessees of new Class Vehicles with its New Vehicle Limited Warranty, which includes three-year/36,000-mile bumper-to-bumper coverage and, for Class Vehicles equipped with the 6.6-liter Duramax diesel engine, five-year/100,000-mile Powertrain Component Coverage. The Duramax Powertrain Component Coverage expressly identifies the integral engine oil cooler as a covered component and also covers other specified engine and powertrain components, including internally lubricated engine parts. GM promised to repair defects in materials or workmanship occurring during the applicable warranty period, including defects in these covered components, at no charge to the vehicle owner and within a reasonable time.

229. GM's written warranty, affirmations, promises, and descriptions concerning the Class Vehicles and their warranty protection created express warranties under Idaho Code §§ 28-2-313 and 28-12-210 and became part of the basis of the bargain.

230. The Class Vehicles did not conform to GM's express warranties when sold or leased. They contained the latent Oil Cooler Defect, which arises from components that are insufficiently strong and durable to withstand the pressures and forces encountered during normal, expected, and foreseeable use.

231. The Oil Cooler Defect substantially impairs the use, value, and safety of the Class Vehicles because it can cause rapid engine-oil loss, contamination of the cooling system, sudden engine failure, loss of vehicle use, and repair costs of tens of thousands of dollars.

232. Plaintiff and Idaho Class members provided GM with timely and adequate notice of the breach by presenting their Class Vehicles to GM-authorized dealers, requesting warranty repairs, communicating with GM and its dealers, and through the filing of this action. GM also had independent and longstanding notice of the Defect and its warranty breaches through the sources alleged above.

233. Plaintiff and the Idaho Class gave GM a reasonable opportunity to cure its breaches. Any further opportunity to cure is unnecessary and futile because GM has failed or refused to provide an effective repair, has denied or limited coverage for resulting engine damage, and continues to use or propose equally defective replacement parts.

234. Any limitation of remedy to repair or replacement has failed of its essential purpose under Idaho Code § 28-2-719(2) because GM has not provided a conforming, effective repair within a reasonable time.

235. To the extent GM relies on any exclusion, disclaimer, or durational limitation to avoid coverage for the Oil Cooler Defect, enforcement of that provision would be unconscionable and contrary to the reasonable expectations GM created because GM knew of and concealed the latent Defect, consumers lacked meaningful bargaining power, and the Defect may manifest only after the purported limitation expires.

236. As a direct and proximate result of GM's breaches, Plaintiff and the Idaho Class received Class Vehicles of substantially impaired value and suffered damages, including the difference between the value of the Vehicles as warranted and as delivered, diagnostic and repair expenses, incidental and consequential damages, and loss of use.

237. Plaintiff and the Idaho Class seek actual, incidental, consequential, and other damages; declaratory and equitable relief; costs and attorneys' fees as allowed by law; and all other relief available under Idaho law.

## EIGHTH CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Idaho Code §§ 28-2-314 and 28-12-212)

238. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

239. Plaintiff Robert Hubof brings this claim on behalf of himself and the Idaho Class.

240. GM is a merchant with respect to motor vehicles. In connection with the sale or lease of the Class Vehicles, GM and its authorized dealers impliedly warranted that the Class Vehicles were merchantable under Idaho Code §§ 28-2-314 and 28-12-212.

241. To the extent privity is required, Plaintiff and the Idaho Class were in privity with GM because GM issued its written warranty directly to them and undertook to perform its warranty obligations through GM-authorized dealers. Plaintiff and the Idaho Class were the intended beneficiaries of the distribution and warranty arrangements between GM and its authorized dealers. The dealers were not the ultimate users of the Class Vehicles or the intended beneficiaries of GM's consumer warranties.

242. The implied warranty of merchantability required that the Class Vehicles pass without objection in the trade and be fit for the ordinary purpose of providing safe, reliable transportation.

243. The Class Vehicles were not merchantable when sold or leased because they contained the Defect. The defective Oil Coolant Systems are prone to cracking, discharging engine oil, depriving the engine of oil, contaminating cooling-system components, and causing sudden engine failure during ordinary and foreseeable use.

244. The Defect existed when the Class Vehicles left GM's control and when they were sold or leased to Plaintiff and the Idaho Class. The Defect substantially impairs the Vehicles' use, value, safety, and reliability.

245. Plaintiff and the Idaho Class used their Class Vehicles in the ordinary and intended manner and complied with their obligations, or were excused from further performance by GM's conduct.

246. Plaintiff and Idaho Class members provided timely and adequate notice by presenting their Class Vehicles to GM-authorized dealers for diagnosis and repair, requesting warranty coverage, communicating with GM and its dealers, and through the filing of this action. GM also had independent notice of the Defect through the sources alleged above.

247. Any purported disclaimer or limitation of the implied warranty is unenforceable and unconscionable because GM knew of and concealed the latent Defect, consumers lacked meaningful bargaining power or an opportunity to

negotiate the warranty terms, and the Defect may manifest only after the purported limitation expires.

248. As a direct and proximate result of the breach of the implied warranty of merchantability, Plaintiff and the Idaho Class suffered damages in an amount to be proven at trial, including overpayment, diminished value, diagnostic and repair expenses, incidental and consequential damages, and loss of use.

249. Plaintiff and the Idaho Class seek all damages and other legal and equitable relief available under Idaho law.

## NINTH CAUSE OF ACTION

### UNJUST ENRICHMENT
### (Idaho Common Law)

250. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

251. Plaintiff Robert Hubof brings this claim on behalf of himself and the Idaho Class. This claim is pleaded in the alternative to the Idaho Breach of Express Warranty claim to the extent required.

252. GM has received and retained a benefit from the Plaintiff and the Idaho Class, and inequity has resulted.

253. GM benefitted while Plaintiff and Class Members, who originally overpaid for their GM cars, have been forced to pay additional out-of-pocket costs and incur additional expenses and losses in connection with repairs.

254. It is inequitable for GM to retain the benefits of its misconduct.

255. As a result of GM's conduct, the amount of GM's unjust enrichment should be disgorged, in an amount according to proof.

## RELIEF REQUESTED

256. Plaintiff, on behalf of himself, and all others similarly situated, request the Court to enter judgment against GM, as follows:

a. an order certifying the proposed Class and/or any appropriate subclasses, designating Plaintiff as named representative of the Class, and designating the undersigned as Class Counsel;

b. a declaration that the Oil Coolant Systems in the Class Vehicles are defective;

c. a declaration that the Class Vehicles are defective in that their Oil Coolant Systems crack, leak engine oil into the Oil Coolant System and outside the vehicle, deprive the engine of oil, contaminate cooling-system components, and cause engine damage or failure. The Defect may not manifest until after the warranty provided by GM has expired. The Defect is material and requires disclosure to all Class Members;

d. a declaration that all Class Members are to be provided the best practicable notice of the defect, which cost shall be borne by GM;

e. a declaration that because the Class Vehicles have the Oil Cooler Defect, and because GM knew of this Defect before the time of sale or lease, the GM warranty is insufficient to remediate the defects know by GM to exist. Therefore, GM's existing warranties are invalid, and, as such, any mileage and time limitations are unenforceable. GM shall provide notice to all persons covered by that warranty of the removal of this time limitation;

f. a declaration that GM shall re-audit and reassess all prior warranty claims, including claims previously denied in whole or in part, where the denial was based on warranty or on other grounds, of claims related to the Oil Cooler Defect in the Class Vehicles;

g. a declaration that GM shall establish a repair program and protocol to be communicated to class members, which will require GM to inspect, upon request, a class member's vehicle to determine whether the Oil Cooler Defect is manifest. Any disputes over coverage shall be adjudicated by a Special Master appointed by the Court and/or agreed to by the parties;

h. an order enjoining GM from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles;

i. an award to Plaintiffs and Class Members of actual, compensatory, exemplary, statutory, and all other available damages allowed by law, including interest, in an amount to be proven at trial;

j. a declaration that GM must disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class Members;

k. an award of attorneys' fees and costs as otherwise allowed by law;

l. an award of pre-judgment and post-judgment interest, as provided by law;

m. leave to amend this Complaint to conform to the evidence produced at trial;

n. such other relief as may be appropriate under the circumstances.

**DEMAND FOR JURY TRIAL**

257. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: September 24, 2026

Respectfully submitted,

*/s/ Dennis A. Lienhardt*
E. Powell Miller (P39487)
Dennis A. Lienhardt (P81118)
THE MILLER LAW FIRM, PC
950 West University, Suite 300
Rochester, Michigan 48306
248-841-2201
epm@millerlawpc.com
dal@millerlawpc.com

Matthew D. Schelkopf
Joseph B. Kenney
SAUDER SCHELKOPF LLC
1109 Lancaster Avenue
Berwyn, PA 19312
610.200.0580
mds@sstriallawyers.com
jbk@sstriallawyers.com

Bonner C. Walsh (admission pending)
WALSH PLLC
1561 Long Haul Road
Grangeville, ID 83530
(541) 359-2827
bonner@walshpllc.com

*Counsel for Plaintiff and the Proposed Classes*

**CERTIFICATE OF SERVICE**

The undersigned herby certifies that on this 24th day of September, 2026, a copy of this Class Action Complaint was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Michigan, using the CM/ECF system, which will send a Notice of Electronic filing to all parties of record.

*/s/ Dennis A. Lienhardt*
Dennis A. Lienhardt (P81118)